[Cite as *In re: S.F. A Minor Child* , 2018-Ohio-2404.]

# Court of Appeals of Ohio

EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA

JOURNAL ENTRY AND OPINION
No. 106738

**IN RE: S.F.**
**A Minor Child**

[Appeal By M.M., Mother]

**JUDGMENT:**
AFFIRMED

Civil Appeal from the
Cuyahoga County Court of Common Pleas
Juvenile Division
Case No. AD 16900870

**BEFORE:** E.T. Gallagher, J., McCormack, P.J., and Jones, J.

**RELEASED AND JOURNALIZED:** June 21, 2018

**ATTORNEY FOR APPELLANT**

Britta M. Barthol
P.O. Box 670218
Northfield, Ohio 44067


**ATTORNEYS FOR APPELLEE**

**For CCDCFS**

Michael C. O'Malley
Cuyahoga County Prosecutor
BY:     Cheryl Rice
Assistant Prosecuting Attorney
8111 Quincy Avenue, Room 440
Cleveland Ohio 44104

BY:     Anthony R. Beery
Assistant Prosecuting Attorney
4261 Fulton Parkway
Cleveland, Ohio 44144

**For Father**

Brian W. Sharkin
Law Office of Brian W. Sharkin
P.O. Box 770824
Lakewood, Ohio 44107

**Also listed**

**Guardian Ad Litem**

Michael H. Murphy
Michael H. Murphy Attorney At Law
20325 Center Ridge Road, Suite 512
Rocky River, Ohio 44116

EILEEN T. GALLAGHER, J.:

**{¶1}** Appellant, Mother, appeals an order of the Cuyahoga County Juvenile Court that awarded permanent custody of her daughter, S.F., to the Cuyahoga County Department of Child and Family Services ("CCDCFS"). She raises two assignments of error:

> 1. The trial court erred when it held a permanent custody hearing without complying with 25 U.S.C. 1912.
>
> 2. The trial court abused its discretion when it determined that permanent custody to CCDCFS was in the best interest of the child.

**{¶2}** We find no merit to the appeal and affirm the trial court's judgment.

### I. Facts and Procedural History

**{¶3}** In January 2016, CCDCFS filed a complaint seeking temporary custody of S.F (d.o.b. May 1, 2015). The agency alleged that S.F. was a neglected child due to her parents' heroin addictions and their failure to meet S.F.'s special medical needs, including a failure to address diagnoses of pneumonia and respiratory syncytial virus. The agency was also concerned about domestic violence in the home. S.F.'s parents did not contest the agency's motion, and the trial court awarded temporary custody of S.F. to CCDCFS.

**{¶4}** The agency developed case plans for both parents to address their addictions, domestic violence, mental health, and parenting issues. Neither parent complied with his or her respective case plan, and it is undisputed that neither parent is able to properly care for S.F. Shortly after CCDCFS obtained temporary custody of S.F., Mother requested that her maternal aunt, N.K., be awarded legal custody of S.F. The agency investigated N.K. for possible placement, but ultimately determined that an award of permanent custody to the CCDCFS was in

S.F.'s best interest. Accordingly, the agency filed a motion to modify temporary custody to permanent custody in November 2016. Mother subsequently filed a motion for an order awarding legal custody of S.F. to N.K.

{¶5} The trial court held a hearing on the competing motions for custody of S.F. Keith Grahl, a child protective service worker employed by CCDCFS, testified that neither of S.F.'s parents are able to care for her due to their untreated heroin addictions and history of domestic violence. Grahl investigated N.K. as a possible candidate for legal custody and found that her home was appropriate except for a strong pet odor. (Dec. 11, 2017 tr. 29.) The presence of the dogs also caused Grahl to sneeze "quite a bit." (Dec. 11, 2017 tr. 29.)

{¶6} N.K. completed foster parenting classes and had no criminal record. Indeed, the agency initially approved her for placement of S.F. but later revoked the approval due to concerns that she did not have the financial means to support S.F. N.K. reported to Grahl that she received $200 per week from her estranged husband even though the couple was not divorced. (Dec. 11, 2017 tr. 48.) Grahl did not think $200 per week was enough to support S.F. and cover N.K.'s other living expenses. Further, N.K. never provided any documentation establishing her income or ability to support N.K. (Dec. 11, 2017 tr. 55.)

{¶7} Grahl was also troubled by the fact that S.F. did not show a bond with N.K. (Dec. 11, 2017 tr. 52.) Grahl testified that during N.K.'s visits with S.F., N.K. would usually "just sit[ ] there" and talk about her other kids and family. (Dec. 11, 2017 tr. 53.) She would say "Hi" to S.F., but she did not engage S.F. during the visits.

{¶8} The agency was also concerned that N.K. would allow Mother to have access to S.F. Mother lived with S.F.'s grandmother, who was N.K.'s sister. Grahl explained that if N.K. had legal custody of S.F., both parents would maintain their parental rights. Grahl believed the

parents' rights needed to be terminated because they continue to abuse drugs, they have not demonstrated any progress in any of their case plan objectives, and S.F. needs a permanent home. (Dec. 11, 2017 tr. 40, 57.)

{¶9} N.K. testified that she is currently unemployed and has not worked outside her home for approximately two years. However, she earns $80 per week babysitting her grandson and confirmed that her estranged husband pays her $200 per week. She also testified that her husband pays the real estate taxes on her home. However, because her estranged husband is not required to make these payments pursuant to any court order, the agency was worried the payments could stop at any time without notice. (Dec. 11, 2017 tr. 84, 85.) The agency was also concerned that N.K. never produced documentation to establish that she actually received these payments.

{¶10} Nevertheless, N.K. promised that she would keep S.F. safe and away from S.F.'s parents. She explained that if S.F.'s parents should come to her house and refuse to leave, she would call the police. She also testified that if the parents misbehaved during a visit at a neutral, public location, she would take S.F. away. (Dec. 11, 2017 tr. 71.) N.K. denied ever telling S.F. that after S.F. comes to live with N.K., N.K. would take her to live at her grandmother's house where Mother lives. (Dec. 11, 2017 tr. 80.)

{¶11} Kenyatta Johnson, a licensed social worker with the Cuyahoga County Public Defender's Office, testified as a defense witness. Prior to her employment with the Public Defender's Office, Johnson was employed by CCDCFS and conducted home visits for custody evaluations. She visited N.K.'s home and found it was appropriate. The ranch-style home had three bedrooms, including a room for S.F. that had a crib, clothes, and toys. The appliances and utilities were in working order, and the home had sufficient food. (Dec. 11, 2017 tr. 89-90.)

Johnson concluded that N.K.'s home was an appropriate home for a small child.

{¶12} Antoinette Willis, a child protection specialist with CCDCFS, testified that she attended two supervised visits with N.K. and S.F. During one of the visits, Willis heard N.K. tell S.F. that S.F. was going to come home with N.K. and that N.K. would take her to live with her grandma. (Dec. 11, 2017 tr. 101.) Willis looked at N.K. in surprise. (Dec. 11, 2017 tr. 101.) Willis testified that N.K. noticed Willis's reaction and changed the statement. Willis explained:

> So she changed up her statement after she seen — I guess, I'm assuming it was when she seen the look on my face. She changed up her statement and she stated that, remember the bedroom with the crib in it that you saw at my house, you can stay in there.

(Dec. 11, 2017 tr. 101.)

{¶13} The guardian ad litem ("GAL") stated that he believed the agency was making too much of the alleged conspiracy to have N.K. obtain legal custody in order to deliver S.F. to her grandmother and Mother. (Dec. 11, 2017 tr. 106.) Nevertheless, the GAL did not think that awarding legal custody to N.K. would be in S.F.'s best interest. He shared the agency's concern that N.K. was not financially capable of caring for S.F. and that she could stop receiving any money provided by her estranged husband at any time. The GAL visited N.K.'s home and found it was an adequate size but needed repairs that would require significant funds from an already tight budget. He testified that the home smelled of dogs and that his dog allergies were triggered even though he took allergy shots. (Dec. 11, 2017 tr. 109.) Earlier, Grahl testified that S.F. has asthma that requires special medical care. (Dec. 11, 2017 tr. 27.)

{¶14} Finally, the GAL testified that S.F.'s foster parents have taken excellent care of her. They have taken her to preschool and doctor's appointments. They have given her everything

she needs, and she was thriving in their care. Therefore, he opined that awarding permanent custody to CCDCFS was in S.F.'s best interests. (Dec. 11, 2017 tr. 110.)

{¶15} Based on the evidence adduced at trial, the trial court awarded permanent custody of S.F. to CCDCFS. Mother now appeals the trial court's judgment.

## II. Law and Analysis

### A. Indian Child Welfare Act

{¶16} In the first assignment of error, Mother argues the trial court erred in holding a permanent custody hearing without complying with the Indian Child Welfare Act ("ICWA"), codified in 25 U.S.C. 1912.

{¶17} The ICWA was enacted in 1978 because a large number of Native American children were being placed in non-Native American foster and adoptive homes. *See* 25 U.S.C. 1901(4). The act addresses these concerns by providing certain procedural safeguards in child custody proceedings when the subject child is an Indian child as defined in 25 U.S.C. 1903.

{¶18} However, in order to invoke the provisions of the ICWA, there must be a preliminary showing that a custody proceeding involves an "Indian child." *In re A.C.*, 8th Dist. Cuyahoga No. 99057, 2013-Ohio-1802, ¶ 41, citing *In re Williams*, 9th Dist. Summit Nos. 20773 and 20786, 2002 Ohio App. LEXIS 271 (Jan.30, 2002), ¶ 22. An "Indian child" is defined as "any unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe[.]" 25 U.S.C. 1903(4). The party asserting applicability of the ICWA bears the burden of proving that the child meets the statutory definition of an "Indian child." *In re A.C.* at ¶ 41. To meet this burden, the party asserting the applicability of the ICWA must do more than simply raise the possibility that a child has Native American ancestry. *In re B.S.*, 184 Ohio

App.3d 463, 2009-Ohio-5497, 921 N.E.2d 320, ¶ 63 (8th Dist.).

{¶19} However, this court has also held that the ICWA imposes a duty on the trial court, in certain circumstances, to inquire of the participating parents as to whether the parent knows, or has reason to know, that the child is an Indian child. For example, in *In re R.G.*, 8th Dist. Cuyahoga No. 104434, 2016-Ohio-7897, this court reversed an award of permanent custody where the trial court's inquiry on the issue of ancestry was limited to the CCDCFS case manager, who possessed no knowledge of the child's ancestry. *Id.* at ¶ 20. The child's mother was not present when the court made the inquiry and therefore could not have addressed the issue. *Id.*

{¶20} In *In re A.G.*, 8th Dist. Cuyahoga No. 105254, 2017-Ohio-6892, this court distinguished and limited the court's holding in *In re R.G.* At the emergency custody hearing in *In re A.G.*, the trial court asked the CCDCFS case worker whether there was any Native American ancestry and she replied that there was not. *Id.* at ¶ 28. Mother, who was represented by counsel, was present in the courtroom and voiced neither an objection nor a correction to the case worker's statement. *Id.* at ¶ 28. At the conclusion of the hearing, the trial court stated in open court and on the record that it found "'no Native American ancestry that we are aware of in this matter.'" *Id.* Again, the mother did not object or offer any additional information regarding the child's ancestry. *Id.*

{¶21} On appeal, the mother argued, citing *In re R.G.*, that the trial court was duty-bound to inquire of the parents whether the child had Native American ancestry. This court distinguished *In re R.G.*, noting that the case worker in that case had no knowledge of the child's ancestry and neither of the parents were present in the courtroom to provide information on the issue. *Id.* at ¶ 32. By contrast, the mother in *In re A.G.* was present with counsel and could have clarified the ancestry issue if the case worker failed to provide accurate information.

Therefore, the court in *In re A.G.* found no violation of the ICWA even though the court questioned the case worker regarding the child's ancestry instead of the child's parents.

{¶22} This case is practically identical to *In re A.G.* Mother was present with counsel at the predispositional temporary custody hearing on January 21, 2016, when counsel asked the case worker if S.F. had any Native American ancestry. Mother neither objected nor offered any alternative information on the issue. And when asked whether S.F. had any Native American ancestry, the case worker affirmatively stated: "There is none." This response indicates the case worker had knowledge regarding S.F.'s ancestry whereas the case worker in *In re R.G.* indicated she had no knowledge on the question of ancestry. *In re R.G.* at ¶ 17. When the court found, in open court and on the record, at the predispositional temporary custody hearing, that S.F. had no Native American ancestry, Mother did not object. (Jan. 21, 2016 tr. 19.) Therefore, under these circumstances, Mother cannot meet her burden of establishing the applicability of the ICWA.

{¶23} The first assignment of error is overruled.

### B. Best Interest of the Child

{¶24} In the second assignment of error, Mother argues the trial court abused its discretion when it determined that awarding permanent custody of S.F. to the CCDCFS was in the best interest of the child. She contends the agency failed to prove, by clear and convincing evidence, that termination of Mother's parental rights was in S.F.'s best interest when there was evidence that S.F. could be securely placed with N.K.

{¶25} R.C. 2151.414 sets forth a two-part test courts must apply when deciding whether to award permanent custody to a public services agency. R.C. 2151.414 requires the court find, by clear and convincing evidence, that (1) granting permanent custody of the child to CCDCFS is

in the best interest of the child, and (2) either the child (a) cannot be placed with either parent within a reasonable period of time or should not be placed with either parent if any one of the factors in R.C. 2151.414(E) are present; (b) is abandoned; (c) is orphaned and no relatives are able to take permanent custody of the child; or (d) has been in the temporary custody of one or more public or private children services agencies for 12 or more months of a consecutive 22-month period.   R.C. 2151.414(B)(1).

{¶26} "'Clear and convincing evidence' is evidence that 'will produce in the mind of the trier of facts a firm belief or conviction as to the allegations sought to be established.'" *In re C.B.*, 8th Dist. Cuyahoga No. 92775, 2011-Ohio-5491, ¶ 28, quoting *Cross v. Ledford*, 161 Ohio St. 469, 477, 120 N.E.2d 118 (1954).

{¶27} It is undisputed that the second prong of the two-part test set-forth in 2151.414(B) has been satisfied.   We must therefore determine whether awarding permanent custody to CCDCFS was in S.F.'s best interests.   In making the "best interest" determination, R.C. 2151.414(D)(1) directs the trial court to consider the following non-exclusive factors:

(a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;

(b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;

(c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period and, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state;

(d) The child's need for a legally secure permanent placement and whether that

type of placement can be achieved without a grant of permanent custody to CCDCFS;

(e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

**{¶28}** This court has consistently held that only one of the factors set forth in R.C. 2151.414(D) needs to be resolved in favor of the award of permanent custody in order for the court to award permanent custody to a proper agency. *In re J.M-R.*, 8th Dist. Cuyahoga No. 98902, 2013-Ohio-1560, ¶ 37, citing *In re Z.T.*, 8th Dist. Cuyahoga No. 88009, 2007-Ohio-827, ¶ 56.

**{¶29}** At the time of trial, S.F. was two and one-half years old and had been in agency custody for 23 months. (Dec. 11, 2017 tr. 110.) She had, therefore, been in agency custody for more than 12 months of a 22-month period. Indeed, S.F. has been in agency custody for most of her life and was closely bonded to her foster parents. By contrast, Grahl testified that S.F. was not bonded to N.K. Although N.K. regularly attended visits with S.F., she did not engage the child during the short period of time they had together. (Dec. 11, 2017 tr. 53.) Therefore, the factors set forth in R.C. 2151.414(D)(1)(a) and 2151.414(D)(1)(c) weigh in favor of permanent custody.

**{¶30}** Additionally, S.F.'s wishes, as expressed by the GAL, weigh in favor of permanent custody. The GAL concluded that permanent custody was in S.F.'s best interest, in part, because N.K. failed to demonstrate that she could provide a stable home for the child. N.K. failed to provide any proof that her estranged husband paid her real estate taxes and gave her $200 per week in voluntary spousal support. Moreover, since N.K.'s estranged husband was not required to provide spousal support pursuant to any court order, she could lose that income at any time without notice. Moreover, Grahl testified that he did not believe the income N.K.

received was enough to care for S.F., particularly since N.K.'s house was very much in need of costly repairs.

**{¶31}** The GAL also believed that awarding permanent custody to CCDCFS would be in S.F.'s best interest because S.F. needed to be separated from her family. (Dec. 11, 2017 tr. 109.) If N.K. obtained legal custody, the parental rights of S.F.'s parents would not be terminated. Yet, S.F.'s parents have made no effort to address their substance abuse or domestic violence issues. The GAL's remarks correctly suggest that the only way to permanently remove S.F. from these issues is through an award of permanent custody. Thus, the factors outlined in R.C. 2151.414(D)(1)(b) and 2151.414(D)(1)(d) weigh in favor of permanent custody.

**{¶32}** As previously stated, only one of the factors set forth in R.C. 2151.414(D) needs to be resolved in favor of permanent custody in order for the court to award permanent custody to a proper agency. *In re J.M-R.*, 8th Dist. Cuyahoga No. 98902, 2013-Ohio-1560, at ¶ 37. In this case, at least four of the factors listed in R.C. 2151.414(D) indicate that permanent custody is in S.F.'s best interest. We therefore cannot say that the trial court abused its discretion in awarding permanent custody of S.F. to CCDCFS.

**{¶33}** The second assignment of error is overruled.

**{¶34}** Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate be sent to the Cuyahoga County Common Pleas Court, Juvenile Division, to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the

Rules of Appellate Procedure.


EILEEN T. GALLAGHER, JUDGE

TIM McCORMACK, P.J., and
LARRY A. JONES, SR., J., CONCUR