[Cite as *In re S.M.*, 2025-Ohio-34.]

| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF SUMMIT | ) | |

IN RE: S.M.

C.A. No.     31068

APPEAL FROM JUDGMENT
ENTERED IN THE
COURT OF COMMON PLEAS
COUNTY OF SUMMIT, OHIO
CASE No.     DN 22 09 0832

DECISION AND JOURNAL ENTRY

Dated: January 8, 2025

CARR, Judge.

{¶1}    Appellant, U.M. ("Mother"), appeals from a judgment of the Summit County Court of Common Pleas, Juvenile Division, that terminated her parental rights and placed her minor child in the permanent custody of Summit County Children Services Board ("CSB").  This Court affirms.

I.

{¶2}    Mother is the biological mother of S.M., born July 27, 2022.  Mother has another minor child, who was also involved in the trial court proceedings, but that child is not a party to this appeal.  S.M.'s father did not appeal from the trial court's judgment.

{¶3}    CSB first became involved with Mother and her older child, T.M., shortly before S.M. was born.  CSB removed then ten-year-old T.M. from Mother's custody shortly before S.M.'s birth, while Mother was living with T.M. in a homeless shelter and caused a disturbance there by screaming at other residents and behaving erratically and irrationally.  Upon investigation, CSB

learned that Mother had been repeatedly and falsely insisting that T.M. had been sexually trafficked, that people were secretly recording Mother and T.M., and that others were out to get them. Mother had been expressing paranoid and delusional thoughts that were so disturbing to T.M. that the trial court sent the child for a trauma assessment. Solely for the non-hearsay statements pertaining to T.M.'s mental health diagnosis, T.M.'s trauma assessment was admitted into the record at S.M.'s adjudicatory and permanent custody hearings.

{¶4} During the trauma assessment, T.M. described numerous incidents, including Mother falsely insisting that T.M. had been sexually abused and that T.M. had been secretly recording Mother through the lights in the home. T.M. stated that Mother frightened her with these "weird ideas" and explained that she would often agree with Mother's delusional thoughts because Mother would punish her if she did not. T.M. told the evaluator that, when she voiced disagreement about the truthfulness of Mother's statements, Mother would physically punish her until she agreed. Consequently, T.M. reported that she often "went along" with whatever Mother said just to "get out of situations." The evaluator diagnosed T.M. with post-traumatic stress disorder and recommended that the child engage in ongoing trauma therapy.

{¶5} S.M. was removed from Mother's custody shortly after birth, after an extended stay in a hospital neonatal intensive care unit to treat the high bilirubin levels in his blood. CSB sought and obtained emergency custody of S.M. because of Mother's ongoing mental health problems and instability in her life. CSB's initial complaint pertaining to S.M. was dismissed because the case did not proceed to adjudication in a timely manner.

{¶6} CSB filed a complaint to commence this case on September 23, 2022, alleging that S.M. was an abused (endangered) and dependent child. The trial court later adjudicated S.M. a dependent child, placed him in the temporary custody of CSB, and adopted the case plan as an

order of the court. The case plan explained that Mother had previously gone to Summit Psychological Associates to obtain a parenting assessment but had been unable to complete the assessment because, according to the mental health professional assigned to evaluate her, she appeared "to be experiencing 'acute psychosis.'" He explained at a later hearing that Mother seemed to be hearing voices, as she was yelling at people who were not present in the room. The mental health professional opined that Mother was too unstable at that time to complete the parenting assessment.

{¶7} Consequently, the initial case plan in this case required Mother to "immediately engage in mental health treatment and specifically medication management through Community Support Services ["CSS"]." It explicitly required Mother to obtain a psychiatric evaluation at CSS, based on the caseworker's experience working with that agency, including her familiarity with the wide range of services that CSS could provide to address Mother's mental health problems. The caseworker wanted to refer Mother to CSS for a psychiatric evaluation, but Mother was not willing to engage in services at that agency. Mother reported that she had engaged in services with CSS in the past, but, because Mother refused to sign an information release and did not explain her experience there, it is unclear from the record why Mother was unwilling to reengage in services at CSS.

{¶8} Before the case plan was adopted, Mother began counseling at Portage Path Behavioral Health ("PPBH"). Although the trial court had required her to go to CSS, she chose to continue services with PPBH. Moreover, despite the case plan requirement that Mother engage in mental health treatment to address her paranoid and psychotic thoughts, Mother's initial counseling at PPBH was limited to her sole diagnosis by that agency, which was adjustment disorder. It is unclear from the record whether Mother initially had a psychiatric evaluation at

PPBH, but it was not until eight or nine months later that Mother was eventually diagnosed with paranoid personality disorder.

{¶9} After the PPBH counselor began addressing Mother's paranoid thoughts, he discovered that Mother had a deep-rooted mistrust of others. He opined that her paranoia stemmed from trauma that she suffered as a child. Mother disclosed that she was removed from her parents' custody as a child by a children services agency, but she was reluctant to talk about the circumstances that led to her removal. Throughout this case, her PPBH counselor had not been able to delve into Mother's past trauma and eventually opined that Mother would require extensive long-term counseling before she could develop an ability to trust and work with other people.

{¶10} Mother eventually began parenting instruction with Bair Foundation during July 2023, but she was aggressive and uncooperative with the service providers at that agency. Mother allowed the counselor to meet with her a few times, disclosed that she had been assaulted as a teenager, but eventually "shut down" and made minimal progress with that agency.

{¶11} CSB never permitted Mother to have unmonitored contact with S.M. because she did not stabilize her mental health problems. Mother continued to exhibit paranoid, aggressive, and threatening behavior and her progress throughout this case was hampered by her mistrust of others and refusal to work with the caseworker, supervisors at the visitation center, service providers, and the guardian ad litem.

{¶12} During her visits with S.M., Mother would almost immediately change the child's diaper. She admitted that she checked him for signs of abuse. Throughout this case, she criticized the care that he was given in the foster home. At one point, Mother became concerned because S.M. had a blistered rash on his buttocks and back that appeared to be getting worse over time. Mother was advised by CSB personnel that the rash had been evaluated by a medical doctor, the

foster family was following the doctor's instructions to treat it, it was highly contagious, and that she should follow the doctor's recommendations for treatment. Nevertheless, Mother continued to insist that the child had been abused in the foster home.

{¶13} On September 13, 2023, CSB moved for permanent custody of S.M., alleging that permanent custody was in the best interest of the child and that he could not or should not be returned to the custody of Mother based on the grounds set forth in R.C. 2151.414(E)(1) and/or (E)(2). Mother alternatively requested that the child be returned to her custody or that the trial court extend temporary custody for another six months.

{¶14} Following an evidentiary hearing before a visiting judge, the trial court terminated Mother's parental rights and placed S.M. in the permanent custody of CSB. Mother appeals and raises three assignments of error. This Court will rearrange her assigned errors to facilitate review.

II.

### ASSIGNMENT OF ERROR II

THE TRIAL COURT COMMITTED REVERSIBLE AND PLAIN ERROR WHEN IT TERMINATED MOTHER'S PARENTAL RIGHTS WITHOUT COMPLYING WITH THE INDIAN CHILD WELFARE ACT AT THE PERMANENT CUSTODY HEARING.

{¶15} Mother's second assignment of error is that the trial court erred by terminating her parental rights because "at no point before, during, or even after the [permanent custody] hearing did the trial court ever inquire as to whether or not S.M. had any Native American ancestry" as it was required to do to under the Indian Child Welfare Act ("ICWA"), as set forth in 25 U.S.C. Ch. 21, Subchapter I, or the related administrative regulations. Mother premises her argument on the duty of the juvenile court "at the commencement of the proceeding" to inquire of "each participant in an . . . involuntary child-custody proceeding" whether there is any reason to believe a child involved is an "Indian child." 25 C.F.R. 23.107(a). Because Mother did not raise this issue in the

trial court, she has forfeited all but plain error on appeal. *See In re T.B.*, 2014-Ohio-4040, ¶ 12 (9th Dist.). Mother has not argued or demonstrated plain error on appeal.

{¶16} This case commenced when CSB filed a complaint, alleging that S.M. was an abused and dependent child. Numbered paragraph 11 of the complaint further alleged that "[CSB] has no reason to know this child to be an Indian child." In its request for interim orders, CSB's complaint explicitly sought "[i]nquiry into Indian Child Welfare Act (ICWA) applicability[.]" The case later proceeded to shelter care and adjudicatory hearings, where Mother appeared and was represented by counsel. Because Mother did not file objections to either the shelter care or adjudicatory orders, however, the record does not include transcripts of those hearings. Therefore, this Court presumes that the trial court conducted an ICWA inquiry at the commencement of these proceedings. *See e.g.*, *In re A.G.*, 2024-Ohio-3091, ¶ 60 (9th Dist.).

{¶17} Moreover, the procedural safeguards set forth in ICWA apply to child custody proceedings only "when the subject child is an Indian child," as defined in ICWA. *In re Williams*, 2002-Ohio-321 (9th Dist.). ICWA defines "Indian child" as "any unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe[.]" 25 U.S.C. 1903(4). This Court has held that the burden rests on the party who asserts the applicability of ICWA to prove that the child meets the criteria for ICWA to apply. *In re Williams*, 2002-Ohio-321 (9th Dist.).

{¶18} In this case, Mother does not point to any evidence in the record, or even allege, that S.M. is an "Indian child" under ICWA. *See id.*; *In re A.C.*, 2013-Ohio-1802, ¶ 43 (8th Dist.), applying *In re Williams*, 2002-Ohio-321 (9th Dist.). Consequently, Mother has failed to demonstrate any error, much less plain error, in the lack of further inquiry into ICWA at the permanent custody hearing. Mother's second assignment of error is overruled.

## ASSIGNMENT OF ERROR III

THE TRIAL COURT COMMITTED REVERSIBLE ERROR WHEN IT GRANTED PERMANENT CUSTODY TO [CSB] AS THE TRIAL COURT'S DECISION WAS NOT SUPPORTED BY EVIDENCE BEYOND A REASONABLE DOUBT AND WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶19} Mother's third assignment of error is partially premised on this Court finding merit in her second assignment of error. Specifically, she maintains that, because the trial court did not rule out the applicability of ICWA to S.M., it was required to apply the heightened evidentiary standard set forth in ICWA to CSB's permanent custody motion. *See* 25 U.S.C. 1912(f). Because this Court found no merit in Mother's second assignment of error, it need not address her third assigned error, insofar as it based on her second. *In re C.W.*, 2024-Ohio-4659, ¶ 26 (9th Dist.).

{¶20} Alternatively, Mother asserts that the trial court's judgment was not supported by clear and convincing evidence. Before a juvenile court may terminate parental rights and award permanent custody of a child to a proper moving agency, it must find clear and convincing evidence of both prongs of the permanent custody test: (1) that the child is abandoned; orphaned; has been in the temporary custody of the agency for at least 12 months of a consecutive 22-month period; the child or another child of the same parent has been adjudicated abused, neglected, or dependent three times; or that the child cannot be placed with either parent, based on an analysis under R.C. 2151.414(E); and (2) that the grant of permanent custody to the agency is in the best interest of the child, based on an analysis under R.C. 2151.414(D)(1). R.C. 2151.414(B)(1) and 2151.414(B)(2); *see also In re William S.*, 75 Ohio St.3d 95, 98-99 (1996).

{¶21} In considering whether the juvenile court's judgment is against the manifest weight of the evidence, this Court "weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [finder

of fact] clearly lost its way and created such a manifest miscarriage of justice that the [judgment] must be reversed and a new [hearing] ordered." (Internal quotations and citations omitted.) *Eastley v. Volkman*, 2012-Ohio-2179, ¶ 20. When weighing the evidence, this Court "must always be mindful of the presumption in favor of the finder of fact." *Id*. at ¶ 21.

{¶22} On the first prong of the permanent custody test, the trial court found that S.M. could not be returned to Mother's custody within a reasonable time or should not be returned to her custody based on two alternative factors under R.C. 2151.414(E): that Mother had failed to substantially remedy the conditions that caused the child to be placed outside the home under R.C. 2151.414(E)(1); and that Mother had chronic mental health problems that prevented her from providing S.M. with a suitable home under R.C. 2151.414(E)(2). R.C. 2151.414(B)(1)(a). Because the trial court was required to find only one factor under R.C. 2151.414(E) to support its "cannot or should not" determination under R.C. 2151.414(B)(1), this Court will confine its review to the trial court's finding under R.C. 2151.414(E)(1) that Mother failed to substantially remedy the conditions that had caused S.M.'s ongoing removal from the home. *See In re R.L.*, 2014-Ohio-3117, ¶ 24 (9th Dist.).

{¶23} S.M. was removed from Mother's care because of Mother's unstable mental health and her inability to meet the child's basic needs. Although Mother was able to obtain stable income and housing during this case, she does not dispute the evidence that she still had not adequately addressed her paranoid personality disorder or its underlying trauma from her past or that she had not completed a parenting program. Instead, she faults CSB for failing to make reasonable efforts to refer her to appropriate service providers. The record reveals, however, that, from the beginning of this case, CSB referred Mother to CSS, an agency that it believed was best equipped to address Mother's mental health needs, but she refused to go there. That referral, along with a requirement

that Mother explicitly obtain a psychiatric assessment to address her apparent paranoia and delusional thoughts, was explicitly incorporated into the case plan. After the trial court adopted the case plan, the parties were bound by its terms. *See* R.C. 2151.412(F)(1). "CSB had an obligation to provide Mother with the enumerated case plan services, but Mother had a 'corresponding obligation' to 'make an effort' to participate in those services." *In re M.B.*, 2023-Ohio-1804, ¶ 32 (9th Dist.), quoting *In re D.B.*, 2006-Ohio-522, ¶ 17 (9th Dist.).

{¶24} CSB wanted to refer Mother to CSS, but she refused to engage in services there. Instead of complying with that aspect of the case plan, Mother insisted in getting mental health services at PPBH. She apparently did not inform that agency about the case plan requirements that she initially obtain a psychiatric assessment aimed at addressing her outward symptoms of paranoia and psychotic thoughts. Consequently, Mother was not diagnosed with paranoid personality disorder, and did not begin treatment to address that problem, until almost one year into this case. Most witnesses agreed at the time of the hearing that Mother had made minimal progress toward stabilizing her paranoid thoughts.

{¶25} The case plan was also amended to add parenting classes because Mother did not seem to understand how to care for her infant child, S.M. Because Mother was unable to complete her first appointment for parenting classes at Summit Psychological, and failed to show for two later appointments, the caseworker referred her to Bair Foundation for parenting classes. Mother began parenting classes at Bair Foundation two months before CSB moved for permanent custody. During her sessions there, Mother was aggressive toward her Bair counselor, refused to allow the counselor into her home except for one meeting, and eventually became so uncooperative with Bair that the agency terminated Mother's case. The counselor testified that Mother did not progress to a point where she had begun to address any of her parenting problems.

**{¶26}** During one session with the Bair service provider, Mother insisted that she was sick and needed to see a doctor. While the provider was driving Mother to a hospital, and was about a block away from a hospital, Mother jumped out of the car. The provider believed that Mother had chosen to walk to the hospital entrance, but according to Mother's later testimony at the permanent custody hearing, for an unexplained reason, she instead chose to make a three-hour walk to another hospital to seek treatment. Moreover, by the time of the hearing, Mother continued to believe that this case had been opened because she was homeless. She insisted that she did not have any mental health problems, and that people were lying about her delusional and paranoid thoughts. As CSB established that Mother had failed to remedy the concerns underlying the child's removal from home, the juvenile court's first prong finding is not against the manifest weight of the evidence.

**{¶27}** Next, the trial court was required to find that permanent custody was in the best interest of the child. When reviewing the trial court's best interest determination, this Court focuses primarily on the specific factors set forth in R.C. 2151.414(D). *In re M.S.*, 2023-Ohio-1558, ¶ 25 (9th Dist.). In making its best interest determination, the trial court was required to consider the statutory best interest factors, which include: the interaction and interrelationships of the child, her wishes, the custodial history of the child, her need for permanence and whether that can be achieved without a grant of permanent custody, and whether any of the factors outlined in R.C. 2151.414(E)(7)-(11) apply. R.C. 2151.414(D)(1)(a)-(e); *see In re R.G.*, 2009-Ohio-6284, ¶ 11 (9th Dist.).

**{¶28}** Mother's interaction with S.M. throughout the child's life had been limited to supervised or monitored visits because Mother continued to exhibit erratic and threatening behavior and failed to demonstrate an ability to meet S.M.'s basic needs during her two-hour visits with the child. For example, S.M. developed a significant rash on his buttocks and back and CSB

personnel informed Mother that it had been diagnosed by the child's doctor as a contagious viral infection, was being treated, and that she should wear gloves when changing his diaper and not squeeze any of the bumps on the child. Nevertheless, Mother ignored the precautions she was given by CSB personnel, squeezed and burst one of the child's fluid-filled welts, and refused to wear gloves while changing his diaper. Mother insisted that the child's welts were symptoms of sexual abuse, and took pictures of his naked buttocks and back, which she introduced into evidence at the permanent custody hearing. The caseworker and the guardian ad litem both expressed concern that Mother continued to believe that S.M. had been abused, despite the opinion of a medical professional that the child had a treatable viral infection that was not connected to any abuse of the child.

{¶29} Because S.M. was too young to express his wishes, the guardian ad litem spoke on his behalf. He opined that permanent custody was in the child's best interest because Mother had not stabilized her mental health, had not completed parenting classes, had never interacted with young S.M. outside a setting that was supervised or monitored by CSB, and was not prepared to provide the child with a stable permanent home. He further expressed concern that Mother had no relationship with or support from her extended family and that she continued to make false allegations that S.M. had been sexually abused, just as she had with his older sibling, T.M.

{¶30} S.M.'s entire custodial history had been spent outside Mother's care. After his birth, S.M. was released from the hospital into CSB's emergency custody. By the time of the permanent custody hearing, this child had spent his entire 18-month life living in foster care and needed a legally secure permanent placement. Although Mother had secured adequate income and housing, she had not stabilized her mental health, and her counselor did not expect her to be able to do so in the near future. Mother admitted that, although she had numerous immediate and

extended family members living near her, she did not maintain a relationship with any of them and could not rely on them for support. The caseworker testified that Mother was alienated from most of her family because of her unresolved mental health problems. CSB had been unable to locate any relatives who were willing and able to provide S.M. with a stable home. Consequently, the trial court concluded that permanent custody would provide the child with a stable permanent home, as the foster family was interested in adopting him.

{¶31} Given the evidence before the trial court, this Court can only conclude that it did not lose its way by terminating Mother's parental rights and placing S.M. in the permanent custody of CSB. *See Eastley* at ¶ 20. Mother's third assignment of error is overruled.

### ASSIGNMENT OF ERROR I

THE TRIAL COURT COMMITTED REVERSIBLE ERROR AND PLAIN ERROR BY FINDING THAT MOTHER DID NOT HAVE STANDING TO REQUEST A SIX-MONTH EXTENSION OF TEMPORARY CUSTODY AND IN DENYING MOTHER'S MOTION FOR [A] SIX-MONTH EXTENSION OF TEMPORARY CUSTODY.

{¶32} Finally, this Court reaches Mother's first assignment of error because it is closely related to her third. As an alternative disposition to permanent custody, Mother requested that the trial court grant a first six-month extension of temporary custody. In its final judgment, the trial court denied Mother's motion for a six-month extension of temporary custody, finding that she did not have standing to request an extension of temporary custody.

{¶33} Although the visiting trial judge explicitly denied the extension based on Mother's purported lack of standing, this Court need not reach the standing issue, as there were several reasons based on the merits of this case that the trial court lacked authority to extend temporary custody. R.C. 2151.415(D)(1) authorized the juvenile court to grant a first extension of temporary custody only if it found, "by clear and convincing evidence" that an extension was in the child's

best interest, "there ha[d] been significant progress on the case plan" and "there [wa]s reasonable cause to believe that the child will be reunified with one of the parents . . . within the period of extension." R.C. 2151.415(D)(1). In this case, the trial court found under R.C. 2151.414(E)(1), based on clear and convincing evidence, that Mother had not made "substantial" progress on the reunification goals of the case plan. The trial court's explicit finding of a lack of "substantial progress" on the case plan equated with an implicit finding of a lack of "significant" progress. Because the trial court found a lack of clear and convincing evidence that Mother had made "significant progress on the case plan[,]" it lacked authority to extend temporary custody.

{¶34} Consequently, under the terms of R.C. 2151.415(D)(1), the circumstances of this case did not warrant an extension of temporary custody, regardless of who had made the motion. Without reaching the standing issue, this Court overrules Mother's first assignment of error based on the evidentiary merits underlying the motion.

III.

{¶35} Mother's assignments of error are overruled. The judgment of the Summit County Court of Common Pleas, Juvenile Division, is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

DONNA J. CARR
FOR THE COURT

SUTTON, P. J.
CONCURS.

FLAGG LANZINGER, J.
CONCURS IN JUDGMENT ONLY.

APPEARANCES:

SHUBHRA AGARWAL, Attorney at Law, for Appellant.

ELLIOT KOLKOVICH, Prosecuting Attorney, and C. RICHLEY RALEY, JR., Assistant Prosecuting Attorney, for Appellee.

NOWAR KATIRJI, Guardian ad Litem.