[Cite as *In re M.J.*, 2025-Ohio-505.]

| | | |
|---|---|---|
| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF MEDINA | ) | |

IN RE: MO.J.
    MK.J.
    E.J.
    T.J.
    A.J.
    MA.J.
    J.J.

C.A. Nos.     2024CA0012-M
                  2024CA0014-M

APPEAL FROM JUDGMENT
ENTERED IN THE
COURT OF COMMON PLEAS
COUNTY OF MEDINA, OHIO
CASE Nos.     2022 02 NE 0016
                2022 02 NE 0017
                2022 02 NE 0018
                2022 02 NE 0019
                2022 02 NE 0020
                2022 02 NE 0021
                2022 02 NE 0022

DECISION AND JOURNAL ENTRY

Dated: February 18, 2025

STEVENSON, Judge.

{¶1} Appellants, M.P. ("Mother") and M.J. ("Father"), appeal from a judgment of the Medina County Court of Common Pleas, Juvenile Division, that terminated their parental rights to two of their minor children and placed four of their other children in the legal custody of a kinship caregiver, M.M. ("Custodian"). This Court affirms.

I.

{¶2} This case originally involved eight minor children, but one of those children reached the age of majority prior to the final dispositional hearing and another turned 18 before the trial court issued its final judgment. Because those two children are no longer juveniles, the parties agreed at oral argument that the oldest two children are not at issue in this appeal. Mother

and Father are the biological parents of the six children subject to this appeal: Mk.J., born April 15, 2008; E.J., born June 4, 2009; T.J., born September 15, 2010; A.J., born January 12, 2016; Ma.J., born March 3, 2017; and J.J., born November 7, 2019.

{¶3} During early 2022, Medina County Job and Family Services ("MCJFS") received a report that Father was selling drugs from the motel room where he and Mother lived with their family. When a caseworker first met with the parents, they denied that they were using drugs or failing to appropriately care for their children, yet they would not allow the caseworker inside the motel room, refused to submit to drug screens, and would not allow the caseworker to speak to the children. MCJFS later filed complaints, alleging that these children were neglected and dependent because the large family was living in two adjoining motel rooms; the children were exposed to ongoing drug use and criminal activity; and the parents were neglecting the children's basic needs, including their need for food, appropriate housing, and supervision. MCJFS did not initially request removal of the children.

{¶4} Although the parents had initially refused to submit to drug testing, court-ordered hair follicle testing later revealed positive drug tests for Father and three of the minor children. On March 22, 2022, the day after the youngest three children tested positive for drugs, the juvenile court ordered the removal of all the children from their parents' custody. It placed them in the emergency temporary custody of MCJFS.

{¶5} Although this case involves an extensive record, it does not include full details about this family. For example, there is no explanation about why some, but not all, of the family members tested positive for drugs. Furthermore, the record includes no details about the history of this family before this case began. At the time the children were removed, the parents had eight minor children who ranged in age from two to 17, as well as one adult child, but there is no

evidence in the record about prior involvement with any children services agencies. Nevertheless, these children came into agency custody with symptoms of a lengthy history of parental neglect, given the poor physical, emotional, and developmental condition of each child.

{¶6} The children were not up to date on medical or dental treatment. Each child suffered from serious dental neglect and required extensive dental treatment including multiple tooth extractions and dental surgeries. The older children also had learning disabilities, which had been identified and were being addressed by their prior schools, but they were not currently enrolled in or attending school. The younger children had not yet attended school but had not met developmental milestones for their respective ages. The two youngest children, then aged two and five, were barely verbal. The five-year-old and six-year-old could not identify letters or letter sounds or numbers.

{¶7} Several of the children showed poor eating and hygiene habits and were not current with their vaccinations and other medical treatment. According to their respective caregivers, the horrendous decay of their teeth was apparent to the average person, as their teeth were discolored, broken, and decayed, and several of the children expressed discomfort because they had dental pain. Each child required extensive dental treatment and, according to the dentists who treated them, their extreme dental decay was likely due to poor diet, poor oral hygiene, and the delay in seeking dental treatment.

{¶8} The trial court adjudicated all the children dependent and also adjudicated the older children neglected on May 16, 2022. The court later placed the children in the temporary custody of MCJFS and adopted the case plan as an order of the court. The case plan required each parent to complete mental health and substance abuse assessments and follow all resulting treatment recommendations; submit to weekly random drug testing; provide the family with stable income

and housing; and demonstrate that they otherwise understood and could meet their children's basic and special needs.

{¶9} While in agency custody, the children were placed in a few different homes, including the home of Custodian, a kinship placement. Several of the children moved between placement homes because of the serious nature of their problems and needs. While in the custody of MCJFS over the next several months, however, the children made significant progress addressing their dental, medical, educational, and behavioral needs. During the same period, however, the parents made minimal progress on the reunification requirements of the case plan. MCJFS required the parents to submit samples for drug testing, but Mother submitted less than 20 percent of the samples requested. Father submitted approximately 35 percent of the samples requested, but he always tested positive for THC and twice tested positive for cocaine. Neither parent engaged in any substance abuse or mental health treatment. They also continued to reside in the same motel room where they lived when the children were removed from their custody.

{¶10} On January 24, 2023, MCJFS filed motions for the youngest two children, Ma.J. and J.J., to be placed in its permanent custody. As to the four older children, the agency moved the trial court to place them in the legal custody of Custodian. Mother requested legal custody of all the children or, alternatively, an extension of temporary custody.

{¶11} Following an evidentiary hearing, the trial court granted the agency's motion to terminate parental rights and place the two youngest children in the permanent custody of MCJFS. It also granted the agency's motion to place the older children in the legal custody of Custodian. Mother and Father appeal and raise a total of three assignments of error. We will address the merits of Father's sole assignment of error with Mother's first because they are closely related.

II.

**FATHER'S ASSIGNMENT OF ERROR**

THE TRIAL COURT ERRED AND ABUSED ITS DISCRETION BY TERMINATING FATHER'S PARENTAL RIGHTS AND GRANTING PERMANENT CUSTODY OF THE CHILDREN TO [MCJFS].

**MOTHER'S ASSIGNMENT OF ERROR I**

THE TRIAL COURT ERRED AND ABUSED ITS DISCRETION BY TERMINATING APPELLANT-MOTHER'S PARENTAL RIGHTS AND GRANTING PERMANENT CUSTODY OF HER TWO YOUNGEST CHILDREN TO [MCJFS], INSTEAD OF GRANTING CUSTODY TO MOTHER OR ALLOWING MOTHER ADDITIONAL TIME TO OBTAIN SUITABLE HOUSING.

{¶12} Mother's first and Father's only assignment of error assert that the trial court's judgment, insofar as it placed their two youngest children in the permanent custody of MCJFS, was against the manifest weight of the evidence. Mother raises several arguments to challenge the trial court's decision, while Father only briefly and vaguely asserts that permanent custody was not in the best interest of the children.

{¶13} Before a juvenile court may terminate parental rights and award permanent custody of a child to a proper moving agency, it must find clear and convincing evidence of both prongs of the permanent custody test: (1) that the child is abandoned; orphaned; has been in the temporary custody of the agency for at least 12 months of a consecutive 22-month period; the child or another child of the same parent has been adjudicated abused, neglected, or dependent three times; or that the child cannot be placed with either parent, based on an analysis under R.C. 2151.414(E); and (2) that the grant of permanent custody to the agency is in the best interest of the child, based on an analysis under R.C. 2151.414(D)(1). R.C. 2151.414(B)(1) and 2151.414(B)(2); *see also In re William S.*, 75 Ohio St.3d 95, 98-99 (1996).

{¶14} In considering whether the juvenile court's judgment is against the manifest weight of the evidence, this Court "weighs the evidence and all reasonable inferences, considers the

credibility of witnesses and determines whether in resolving conflicts in the evidence, the [finder of fact] clearly lost its way and created such a manifest miscarriage of justice that the [judgment] must be reversed and a new [hearing] ordered." (Internal quotations and citations omitted.) *Eastley v. Volkman*, 2012-Ohio-2179, ¶ 20. When weighing the evidence, this Court "must always be mindful of the presumption in favor of the finder of fact." *Id*. at ¶ 21.

{¶15} On the first prong of the permanent custody test, the trial court found two alternative grounds: that Ma.J. and J.J. had been in the temporary custody of MCJFS for at least 12 months of a consecutive 22-month period under R.C. 2151.414(B)(1)(d); and that they could not be returned to their parents' custody within a reasonable time or should not be returned to their custody because the parents failed to substantially remedy the conditions that led to the initial and ongoing removal of the children from their custody. R.C. 2151.414(B)(1)(a); R.C. 2151.414(E)(1). Father does not challenge the trial court's first prong finding.

{¶16} Mother argues that the evidence did not support the trial court's finding that Ma.J. and J.J. cannot or should not be returned to her custody pursuant to R.C. 2151.414(B)(1)(a), but she does not dispute its alternative finding that they had been in the agency's temporary custody for at least 12 of 22 months under R.C. 2151.414(B)(1)(d). Normally, this Court would emphasize that the first prong of the permanent custody test is satisfied if the record supports any one of the trial court's alternative findings by clear and convincing evidence. *See In re A.D*., 2020-Ohio-526, ¶ 11 (9th Dist.).

{¶17} In this case, however, the record does not support that trial court's alternative "12 of 22" finding. "For the purposes of [R.C. 2151.414(B)(1)(d)], a child shall be considered to have entered the temporary custody of an agency on the earlier of the date the child is adjudicated . . . or the date that is sixty days after the removal of the child from home." R.C. 2151.414(B)(1).

These children were adjudicated on May 16, 2022, which was earlier than May 21, 2022 (60 days after their March 22 emergency removal from the home). *See id*. Therefore, for purposes of the "12 of 22" calculation, the children entered the agency's temporary on May 16, 2022, and MCJFS moved for permanent custody less than nine months later, on January 24, 2023. *See id*.; *In re C.W.*, 2004-Ohio-6411, syllabus ("Before a public children-services agency . . . can move for permanent custody of a child . . . , the child must have been in the temporary custody of an agency for at least 12 months of a consecutive 22–month period.").

{¶18} Because the trial court's "12 of 22" finding was not supported by the record, this Court must address Mother's challenge to the trial court's finding that she failed to substantially remedy the conditions that caused Ma.J. and J.J. to remain placed outside the home. R.C. 2151.414(B)(1)(a); R.C. 2151.414(E)(1). Mother points to evidence that she completed a mental health evaluation and parenting classes, submitted several negative drugs screens, and her testimony that she would soon have appropriate housing.

{¶19} The evidence was not disputed, however, that by the time of the permanent custody hearing in September 2023, Mother had not complied with numerous aspects of the case plan. Mother was ordered to submit weekly drug screens, for a total of 64 drugs screens, but she submitted only 18 during the life of this case. Mother stopped submitting any drug screens nearly six months before the final dispositional hearing. Although those 18 samples tested negative for drugs, Mother failed to submit the vast majority of weekly drug screens that were required by MCJFS.

{¶20} The agency presented evidence that it had informed Mother that its policy was to presume that missed drug screens would have been positive. Even without that presumption, Mother did not engage in any drug treatment during this case and failed to demonstrate that she

had abstained from drug use for any extended period during this case. Throughout this case, Mother insisted that she had not used drugs and did not need treatment.

{¶21} The psychologist who evaluated Mother diagnosed her with bipolar disorder with psychotic features, as well as symptoms of anxiety and depression. The psychologist explicitly recommended that Mother engage in psychiatric treatment and ongoing mental health counseling, which became a requirement of the case plan. Mother initially refused to engage in any mental health treatment. She later began, and stopped, counseling services at three different agencies but did not consistently engage in services with any of them. Although Mother was required to engage in ongoing mental health treatment, she did not believe that she had any mental health problems or needed any treatment.

{¶22} By the time of the hearing, several witnesses expressed concern that Mother did not accept responsibility for the circumstances of her family and had gained no insight into how to meet the needs of her children. Mother denied that she had mental health or drug problems and consistently blamed others for her children's problems. For example, Mother continued to insist that three of the children had tested positive for methamphetamine and other drugs at the beginning of this case because they had been exposed to fumes through the ventilation system in the motel where they lived. The agency and the court did not believe that explanation and, even if the explanation were plausible, the parents continued to live in the same, unsuitable location throughout this case. Mother testified that she would soon have appropriate housing, but she had not secured that housing by the time of the hearing.

{¶23} Mother also testified that the children had no unmet educational, medical, dental, or other basic needs while they lived in her care. As to Ma.J. and J.J., numerous witnesses testified that the children came into agency custody at the ages of 2 and five years old and were nonverbal.

Although J.J. was only two years old, Ma.J. was old enough to be attending kindergarten but was not fully toilet trained and could not communicate in a manner that could be understood. He was also unable to identify letters by name or sound and did not know his numbers. After more than one year of living in foster care and working to address their developmental delays, these children had made significant progress in that regard.

{¶24} Moreover, numerous witnesses testified about the serious dental neglect of each of the children, which was visible to a layperson by simply looking at the color and shape of the children's teeth. The children had been through and would continue to require extensive dental treatment to remedy the problems with their teeth. Mother attempted to dispute that testimony by claiming that witnesses had exaggerated the problems with the children's teeth and that the tooth decay was not apparent to her. She claimed that the children brushed their teeth regularly and had received dental care. The trial court explicitly stated that it did not believe that testimony.

{¶25} The evidence before the trial court clearly and convincingly established that Mother had not adequately addressed her substance abuse and mental health problems, had not secured suitable housing for her children, and failed to gain insight into her past parenting shortcomings or demonstrate that she could appropriately meet the needs of young Ma.J. and J.J. The trial court did not lose its way by concluding that Mother had failed to substantially remedy the conditions that caused the continued removal of Ma.J. and J.J. from her custody.

{¶26} Next, both parents challenge the trial court's finding that permanent custody was in the best interest of Ma.J. and J.J. Mother raises an argument under both her first and second assignments of error that, rather than permanently placing her children outside her custody, it was in the children's best interest for the trial court to have extended temporary custody for another six months. R.C. 2151.415(D)(1) authorized the juvenile court to grant a first extension of temporary

custody only if it found, "by clear and convincing evidence" not only that an extension was in the children's best interest and there was reasonable cause to believe that the children could be permanently placed within the extension period, but also that "there ha[d] been significant progress on the case plan[.]"

{¶27} As already explained, this Court upheld the trial court's first prong finding under R.C. 2151.414(E)(1) that clear and convincing evidence demonstrated that Mother had not made "substantial" progress on the reunification goals of the case plan. "The trial court's explicit finding of a lack of 'substantial progress' on the case plan equated with an implicit finding of a lack of 'significant' progress." *In re S.M.*, 2025-Ohio-34, ¶ 33 (9th Dist.). "Because the trial court found a lack of clear and convincing evidence that Mother had made 'significant progress on the case plan[,]' it lacked authority to extend temporary custody." *Id.*

{¶28} Therefore, this Court will review whether the evidence supported the trial court's finding that permanent custody was in the best interest of Ma.J. and J.J. When reviewing the trial court's best interest determination, this Court focuses primarily on the specific factors set forth in R.C. 2151.414(D). *In re M.S.*, 2023-Ohio-1558, ¶ 25 (9th Dist.). In making its best interest determination, the trial court was required to consider the statutory best interest factors, which include: the interaction and interrelationships of the children, their wishes, the custodial history of the children, their need for permanence and whether that can be achieved without a grant of permanent custody, and whether any of the factors outlined in R.C. 2151.414(E)(7)-(11) apply. R.C. 2151.414(D)(1)(a)-(e); *see also In re R.G.*, 2009-Ohio-6284, ¶ 11 (9th Dist.).

{¶29} Throughout this case, the parents' interaction with Ma.J. and J.J. was limited to weekly, supervised visitation. The parents regularly attended visits but often arrived late. The frequency and duration of their visits never increased, and they were not permitted to have

unsupervised visits because they did not comply with the mental health and substance abuse components of the case plan.

{¶30} Ma.J. and J.J. were initially placed together in the same foster-to-adopt home, but Ma.J. was later removed from the home because of his serious behavioral problems. In fact, both Ma.J. and J.J. had difficulty controlling their emotions and behavior. Ma.J. threw physically violent temper tantrums that would last for extended periods of time, during which J.J. became extremely upset and would "shake" and "shut down[.]" After Ma.J. was moved to another foster home with older children and began engaging in weekly counseling, his behavior improved significantly.

{¶31} Although Ma.J. and J.J. were placed with separate foster families, each child had become comfortable with their respective caregiver and became bonded with their entire families. The foster families had consistently addressed each child's developmental delays and serious dental needs, as well as their medical, emotional, and other basic needs. The children had made significant advances and were thriving in those homes.

{¶32} Because Ma.J. and J.J. were too young to express their own wishes about where they wanted to reside, the guardian ad litem testified on their behalf. He opined that permanent custody was in their best interest. He expressed particular concern that the parents did not seem to understand their responsibility for exposing their children to drug use or for neglecting their basic needs, which had caused the children to suffer physically and emotionally. He did not believe that the parents were honest with him and was extremely disappointed that they did not put in the effort to make progress on the case plan.

{¶33} By the time of the hearing, the children's custodial history had included well over one year in the temporary custody of MCJFS. This Court has often emphasized that an extended

period of time in agency custody should not be held against the parents without considering the reasons for it and the implications that it had on the children. *See*, *e.g.*, *In re E.C.*, 2005-Ohio-1633, ¶ 15 (9th Dist.). While living in foster care, each child made significant advances physically, emotionally, and developmentally. The time the children spent outside their parents' custody demonstrated that they could flourish in a safe, stable, and supportive environment. During that same period, however, the parents had accomplished very little while working toward reunification with their children.

**{¶34}** Mother emphasizes on appeal that these children had spent their entire lives in the parents' custody before this case began when Ma.J. was five and J.J. was two. Although Mother suggests that the custodial history factor weighed in her favor, the record demonstrates otherwise. As explained already, prior to the children's removal from their parents' custody, they were exposed to drug use and their basic needs were not otherwise met. As a result, each child suffered significant physical, emotional, and developmental damage and would require an extended period with a loving and supportive caregiver to address all those problems. These children needed a legally secure permanent placement and CSB had been unable to locate any suitable relatives who were willing to provide such a placement.

**{¶35}** Given the evidence before the trial court, this Court cannot say that it lost its way by terminating parental rights and placing Ma.J. and J.J. in the permanent custody of MCJFS. Mother's first and Father's only assignments of error are overruled.

## MOTHER'S ASSIGNMENT OF ERROR II

THE TRIAL COURT ERRED AND ABUSED ITS DISCRETION BY GRANTING LEGAL CUSTODY OF THE FOUR OLDER MINOR CHILDREN TO A KINSHIP THIRD-PARTY, INSTEAD OF GRANTING CUSTODY TO MOTHER OR ALLOWING MOTHER ADDITIONAL TIME TO OBTAIN SUITABLE HOUSING.

**{¶36}** Mother's second assignment of error is that the trial court's decision to place the four older children in the legal custody of Custodian was not in their best interest. Mother had alternatively requested that the children be returned to her custody, which she maintains was in their best interest.

**{¶37}** An award of legal custody must be supported by a preponderance of the evidence. *In re M.F.*, 2016-Ohio-2685, ¶ 7 (9th Dist.). "Preponderance of the evidence entails the greater weight of the evidence, evidence that is more probable, persuasive, and possesses greater probative value." (Internal quotations omitted.) *Id.* In considering whether the juvenile court's judgment is against the manifest weight of the evidence, this Court "weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [finder of fact] clearly lost its way and created such a manifest miscarriage of justice that the [judgment] must be reversed and a new [hearing] ordered." (Internal citations and quotations omitted.) *Eastley*, 2012-Ohio-2179, at ¶ 20. When weighing the evidence, this Court "must always be mindful of the presumption in favor of the finder of fact." *Id.* at ¶ 21.

**{¶38}** "Following an adjudication of neglect, dependency, or abuse, the juvenile court's determination of whether to place a child in the legal custody of a parent or a relative is based solely on the best interest of the child." *In re K.H.*, 2016-Ohio-1330, ¶ 12 (9th Dist.). No specific test or set of criteria is set forth by statute regarding an award of legal custody, but Ohio courts agree that the juvenile court must base its decision to award legal custody on the best interest of the child. *In re B.B.*, 2016-Ohio-7994, ¶ 18 (9th Dist.), quoting *In re N.P.*, 2004-Ohio-110, ¶ 23 (9th Dist.).

**{¶39}** The juvenile court is guided by the best interest factors enumerated in R.C. 2151.414(D) relating to permanent custody. *In re B.G.*, 2008-Ohio-5003, ¶ 9 (9th Dist.), citing *In*

*re T.A.*, 2006-Ohio-4468, ¶ 17 (9th Dist.). Those factors include the interaction and interrelationships of the child, the child's wishes, the custodial history of the child, the child's need for permanence, and whether any of the factors of R.C. 2151.414(E)(7)-(11) apply to this case. R.C. 2151.414(D)(1)(a)-(e); *see also In re B.C.*, 2014-Ohio-2748, ¶ 16 (9th Dist.).

{¶40} The juvenile court may also consider the best interest factors in R.C. 3109.04(F)(1). *In re K.A.*, 2017-Ohio-1, ¶ 17 (9th Dist.). While many factors overlap with those set forth in R.C. 2151.414(D)(1), separate factors include the child's adjustment to "home, school, and community[,]" and the proposed custodian's likelihood to honor and facilitate visitation or parenting time. R.C. 3109.04(F)(1)(d),(f).

{¶41} As explained in the best interest analysis pertaining to Ma.J. and J.J., Mother's interaction with all the children was limited to weekly, supervised visits throughout this case because she did not work on the case plan. The children had been placed with Custodian because she had been a parent-figure to Mk.J. for nearly 10 years when this case began because Custodian's child was Mk.J.'s best friend. Mk.J. remained in her home throughout this case. E.J. moved in and out of the placement with Custodian home because of her own emotional problems but had settled back into Custodian's home later in the case. A.J. and T.J. were placed with Custodian after they were in a foster home that did not work out.

{¶42} While in Custodian's home, the children had settled into a stable lifestyle and all their needs were being addressed. As with the younger children, Mk.J., E.J., T.J., and A.J. each came into foster care with symptoms of serious dental neglect and required extensive dental treatment after they were removed from their parents' custody. Some of the children also had medical and behavioral issues.

{¶43} Custodian had been working with the children and all their service providers to ensure that their needs were being met. Each child had made great progress in her care and was comfortable in her home. In addition to meeting their dental, medical, and emotional needs, Custodian had been working with the children to get them on track in school. The three older children were on individualized educational programs ("IEPs") and were working with specialists at school to address their educational needs. A.J., who was six years old when she came into Custodian's care, was not fully potty trained and was not prepared to move on to first grade, so Custodian asked the school to have her repeat kindergarten. By the time of the hearing, A.J. was in first grade and was doing very well.

{¶44} These children expressed their wishes to the guardian ad litem and each of them consistently expressed a desire to remain in the home of Custodian. None of them wanted to return to the custody of Mother. They expressed negative memories of living in the motel, not having enough food, and not feeling safe and secure. The guardian ad litem agreed that legal custody to Custodian was in their best interest because Mother had failed to resolve her parenting problems or accept any responsibility for the circumstances and condition of her children.

{¶45} The custodial history of these children had included over a year of living in agency custody. During that time, the children had developed a close bond with Custodian, who met all their needs. As explained already, the fact that they were in Mother's custody for many years prior to this case does not weigh in Mother's favor. The record does not detail what the children endured while living in the care of Mother for the early years of their lives, but the physical, developmental, and emotional condition of each child at the beginning of this case demonstrated that Mother had neglected many of their needs while they lived in her care, causing them to suffer adverse emotional, physical, and developmental consequences.

**{¶46}** The parents were not prepared to provide these children with a suitable permanent home and MCJFS had been unable to find another suitable relative who was willing to do so. Because Custodian had demonstrated her ability and willingness to provide these four children with a safe and stable permanent home, the trial court reasonably concluded that legal custody to Custodian was in the best interest of Mk.J., E.J., T.J., and A.J. Mother's second assignment of error is overruled.

### III.

**{¶47}** The parents' assignments of error are overruled. The judgment of the Medina County Court of Common Pleas, Juvenile Division, is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Medina, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

SCOT STEVENSON
FOR THE COURT

FLAGG LANZINGER, P. J.
CARR, J.
CONCUR.

APPEARANCES:

JOSEPH F. SALZGEBER, Attorney at Law, for Appellant.

WESLEY A. JOHNSTON, Attorney at Law, for Appellant.

TIMOTHY D. SMANIK, Attorney at Law, for Appellee.

BRENT A. CICERO, Guardian ad Litem.