[Cite as *In re L.M.*, 2024-Ohio-5549.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

WARREN COUNTY

IN RE:                                    :

    L.M.                                   :    CASE NOS. CA2024-06-035
                                                                        CA2024-06-042
                                          :
                                               O P I N I O N
                                          :    11/25/2024

                                          :

                                          :


APPEAL FROM WARREN COUNTY COURT OF COMMON PLEAS
JUVENILE DIVISION
Case No. 22-D000033


David P. Fornshell, Warren County Prosecuting Attorney, and Kirsten A. Brandt, Assistant Prosecuting Attorney, for appellee.

Anne Harvey, for appellant, Mother.

Lauren L. Clouse, for appellant, Father.

Andrew Brenner, guardian ad litem.



**M. POWELL, J.**

{¶ 1} SJ ("Mother") and EM ("Father") separately appeal the decision of the

Warren County Court of Common Pleas, Juvenile Division, granting permanent custody

of their two-year-old daughter, Lucy, to Warren County Children Services ("the Agency").[1] This court consolidated the appeals for review. For the reasons outlined below, we reverse the juvenile court's decision and remand for further proceedings.

## I. Factual and Procedural Background

{¶ 2} Lucy, born in January 2022, is a special needs child. Lucy was born with hypotonia and suffers from epilepsy, which sometimes results in seizures on the right side of her body. Lucy's condition is controlled well with medication, nonetheless, Lucy requires regular medical appointments every three months which include electroencephalograms. Failing to attend her medical appointments or missing regular medication puts Lucy at risk of having her seizures return. Lucy also lags in language skills and is in speech and occupational therapy.

{¶ 3} In March 2022, an incident occurred between Mother and Father in which Father repeatedly attempted to kill himself with medications, by hanging himself, and by forcing Mother to stab him in the stomach with a knife. During the altercation, Father slapped Mother while she was holding Lucy, causing Mother to blackout. As a result, Father was convicted of domestic violence, the Agency became involved with the family, and a safety plan was put in place.

{¶ 4} On June 3, 2022, Mother and Father were involved in another physical altercation, and Father was later convicted of a second domestic violence incident. On the same day, Lucy was removed from her parents' custody and placed with a foster family where she has remained throughout the pendency of this case. On June 6, 2022, the Agency filed a complaint alleging Lucy was dependent and abused. The juvenile

---

1. Lucy is a pseudonym adopted for this opinion for the purposes of privacy and readability. *In re D.P.*, 2022-Ohio-4553, ¶ 1, fn. 1 (12th Dist.).

court held an emergency custody hearing that same day and placed Lucy in the temporary custody of the Agency. The Agency later withdrew the allegation of abuse and, on August 11, 2022, the juvenile court adjudicated Lucy dependent and continued temporary custody to the Agency. The Agency prepared a case plan with the goal of remedying the reasons for Lucy's removal and ultimately reunifying Lucy with her Mother and Father.

{¶ 5}  On the Agency's motion, temporary custody was extended in May 2023 and again in October 2023. On February 7, 2024, the Agency filed a motion for permanent custody. A permanent custody hearing was conducted on April 29, 2024 and May 23, 2024. The evidence at the commencement of the hearing indicated that Mother and Father had substantially complied with their case plans, however concerns remained about their ability to implement Lucy's care plan as they had attended no more than half of Lucy's medical appointments, and neither parent has a car or driver's license.

{¶ 6}  During the adjournment, between the initial permanent custody hearing in April and its continuation in May, the parents' situation deteriorated precipitously. Father was again charged with domestic violence against Mother, resulting in a protection order against Father and in favor of Mother. Father then resorted to living in a tent under a bridge in Trenton, Ohio. Despite the protection order and potential for danger, Mother and Father were seen together at their apartment in Trenton. Additionally, Father broke his hand when he punched a fan in a fit of anger, and subsequently lost his job because he could not work. Meanwhile, Mother was pending eviction from the apartment.

{¶ 7}  On May 28, 2024, the juvenile court granted the Agency's motion for permanent custody, finding that permanent custody was in Lucy's best interest. Mother and Father each timely appealed.

**II. Legal Analysis**

{¶ 8} On appeal, Mother raises three assignments of error and Father raises one assignment of error for our review. For ease of discussion we first address Mother's second assignment of error.

{¶ 9} Mother's Assignment of Error No. 2:

THE TRIAL COURT COMMIT PLAIN ERROR WHEN IT FAILED TO INQUIRE DURING THE PERMANENT CUSTODY TRIAL IF THE CHILD WAS ELIGIBLE FOR MEMBERSHIP IN A FEDERALLY RECOGNIZED INDIAN TRIBE AND THE STATUTORY TIME LIMIT HAD NOT YET EXPIRED. [SIC]

{¶ 10} For the first time, on appeal, Mother argues that the trial court committed plain error by failing to conduct the inquiries dictated by the Indian Child Welfare Act (ICWA) as found in 25 U.S.C. 1911. There is no indication in the record that any inquiry with regard to ICWA was ever conducted. Mother raised no objection below, however, Mother asserts that "the duty to inquire is so fundamental that a failure to follow the federal statutes and regulations is tantamount to plain error." For the reasons discussed below, we find that the trial court's failure to conduct any inquiry was plain error.

The Indian Child Welfare Act

{¶ 11} Congress enacted the Indian Child Welfare Act in 1978 out of concern that "an alarmingly high percentage of Indian families are broken up by the removal, often unwarranted, of their children from them by nontribal public and private agencies." *Haaland v. Brackeen*, 599 U.S. 255, 265 (2023), quoting 25 U.S.C. 1901(4). Congress recognized that "there is no resource that is more vital to the continued existence and integrity of Indian tribes than their children and that the United States has a direct interest, as trustee, in protecting Indian children who are members of or are eligible for membership in an Indian tribe." 25 U.S.C. 1901(3).

{¶ 12} Therefore, ICWA requires state courts to inquire of "each participant in an

emergency or voluntary or involuntary child-custody proceeding" whether there is any reason to believe the children involved are a member of or eligible for membership in an Indian tribe. 25 C.F.R. 23.107(a) and 23.2. If there is, various procedural requirements exist within ICWA which aim to keep Indian children connected to Indian families and Indian foster families. *Haaland* at 265.

{¶ 13} "The inquiry is made at the commencement of the proceeding and all responses should be on the record." 25 C.F.R. 23.107(a). Further, "State courts must instruct the parties to inform the court if they subsequently receive information that provides reason to know the child is an Indian child." *Id.* A court's failure to identify Indian children can nullify court proceedings that have not been conducted in accordance with the Act. Adm.Code 5101:2-53-02.

### Plain Error

{¶ 14} In a recent decision, this court held that a parent who fails to raise issues regarding ICWA at the trial level forfeits all but plain error. *In re A.R.B.*, 2024-Ohio-4830, ¶ 16 (12th Dist.). Notably, the plain error doctrine has its origins with criminal law, and the Supreme Court of Ohio has stressed that the doctrine should only be applied in civil appeals "in *the extremely rare* case involving *exceptional* circumstances where [the] error, to which no objection was made at the trial court, seriously affects the basic fairness, integrity, or public reputation of the judicial process, thereby challenging the legitimacy of the underlying judicial process itself." (Emphasis added.) *Goldfuss v. Davidson*, 79 Ohio St.3d 116, 121-123, 1997-Ohio-401 (1997).

{¶ 15} "To demonstrate plain error . . . the party asserting error must show that an error occurred, that the error was plain, and that the error affected his substantial rights." *State v. Wilks*, 2018-Ohio-1562, ¶ 52; *see* Crim.R. 52(B). Ohio courts have commonly

interpreted "affecting substantial rights" to mean that the trial court's error must have affected the outcome of the trial. *A.R.B.* at ¶ 16, citing *State v. Barnes*, 94 Ohio St.3d 21, 27, 2002-Ohio-68.

**{¶ 16}** The present case poses a unique problem for the typical plain error formulation. Here, there is nothing in the record demonstrating that the juvenile court made any attempt to comply with the inquiry requirements of ICWA. As there was no inquiry, there is also no evidence in the record whether Lucy is an Indian child for the purposes of ICWA.[2] Therefore, it is impossible for this court to say whether the outcome of this trial would have been different but for the lack of inquiry.

**{¶ 17}** Nevertheless, ICWA puts a duty on the trial court and its magistrates to first make proper inquiries before any party asserting its applicability bears the burden of proving so. *A.R.B.*, at ¶ 21; *see In re R.G.*, 2016-Ohio-7897 ¶ 16-18 (8th Dist.) (reversing and remanding to conduct ICWA inquiries where the juvenile court failed to address ICWA inquiries to the relevant parties with actual knowledge of the child's ancestry despite ample opportunities). "It is not possible to determine whether the ICWA applies or does not apply if the proper inquiry pursuant to 25 C.F.R. 23.107 is not made." *In re D.E.*, 2021-Ohio-524, ¶ 60 (10th Dist.) (reversing and remanding to conduct ICWA inquiries

---

2. **{¶ a}** In its answer brief, the Agency argues that Mother only provided transcripts of the permanent custody hearing, but the trial court could have made the inquiry at another hearing in the case, therefore, without these other transcripts in the appellate record, this court should presume the regularity of the proceedings. We disagree.

**{¶ b}** The permanent custody proceeding is considered by the regulations as a separate proceeding in which the inquiry must be provided. Pursuant to 25 C.F.R. 23.2, a "child-custody proceeding" includes any action, other than an emergency proceeding that may culminate in one of four outcomes: (i.) Foster-care placement; (ii) Termination of parental rights; (iii) Preadoptive placement; and (iv) Adoptive placement. "An action that may culminate in one of these four outcomes is considered a separate child-custody proceeding from an action that may culminate in a different one." 25 C.F.R. 23.2(2). Thus, because the permanent custody proceeding in this case is a "child custody proceeding" separate from the underlying dependency and temporary custody proceedings, ICWA and its attendant regulations require that the inquiry be given during the permanent custody proceeding without regard to whether it may have been given in a prior proceeding.

where the juvenile court failed to make the proper ICWA inquiries). "This duty is hardly onerous and can be satisfied with a 'yes' or 'no' answer to a single question." *R.G.* at ¶ 18.

{¶ 18} As the Ohio Supreme Court has recognized, "We are unaware of any court's holding that the outcome-determinative inquiry for determining the prejudice-prong of the plain-error analysis is the exclusive means of finding that a plain error is one affecting 'substantial rights.'" *State v. Bond*, 2022-Ohio-4150, ¶ 23. Moreover, Crim.R. 52(B) does not contain any language that the error must have affected the outcome of the trial, and simply states that "'[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court.'" *Id.* at ¶ 25, quoting Crim.R. 52(B). Thus, the Ohio Supreme Court and United States Supreme Court have expressly left open the possibility that "There may be a special category of forfeited errors that can be corrected, regardless of their effect on the outcome." *Bond* at ¶ 23, quoting *United States v. Olano*, 507 U.S. 725, 735 (1993). We find that the complete failure of the trial court to conduct the necessary inquiries under ICWA presents such a plain error affecting substantial rights.[3]

{¶ 19} In consideration of the unique status of Indian Tribes in the United States, tribal sovereignty and jurisdiction, and concern for the survival of Indian culture, by enacting ICWA Congress imposed a unique duty on juvenile courts to inquire whether

---

3. {¶ a} We note that a finding of plain error is not automatic where the juvenile court does not fully comply with ICWA's requirements. In *A.R.B.*, this court found that even though the juvenile court did not fully comply with the inquiry requirements of ICWA, its journalized entries addressing ICWA and its deficient inquiries in the presence of the appellants was sufficient to, at the very least, put them on notice of the issue. Because the appellants could have easily raised and litigated the issue, the deficiency in the inquiries did not amount to plain error. *In re A.R.B.* at ¶ 21.

{¶ b} Following similar logic, although without applying the plain error doctrine, the Eighth District Court of Appeals has declined to find reversible error where parents were aware of the potential ICWA issue and still failed to object. *See, e.g.*, *In re A.G.*, 2017-Ohio-6892 (8th Dist.); *In re N.H.*, 2016-Ohio-1547 (8th Dist.); *In re: A.C.*, 2013-Ohio-1802 (8th Dist.); *In re S.F.*, 2018-Ohio-2404, ¶ 19-22 (8th Dist.).

there is any reason to believe the children involved in a custody proceeding are a member of or eligible for membership in an Indian tribe. To not find error, where a trial court has made no attempt at inquiry, would shift the entire burden of asserting a child's Indian status on the putative parents and defy the text of the Act.

{¶ 20} A proper ICWA inquiry is essential to ensure long-term stability and the best interests of the child. A court's failure to identify Indian children can nullify court proceedings that have not been conducted in accordance with the Act. Adm.Code 5101:2-53-02. Further, "[t]he collateral consequences of not making a proper inquiry are potentially severe and could cause significant disruption for children and families affected by the same beyond termination of a permanent custody case." *In re: D.E.* at ¶ 61. Significantly, pursuant to 25 U.S.C. 1914 and with no apparent time limitation on when the collateral action may be brought—the Indian child, a parent, an Indian custodian of the child, or the child's tribe may petition a court to invalidate foster care placements and terminations of parental rights if the state court violated any provision included in 25 U.S.C. 1911, 1912, or 1913. *Id.* at ¶ 61, fn. 10, citing *In re Morris*, 491 Mich. 81, 101 (2012).

{¶ 21} Because there is no indication in the record that the juvenile court even attempted to make the necessary ICWA inquiry, and because there is no indication that Mother was ever put on notice of the potential for ICWA to apply, we find the trial court committed plain error.[4]

{¶ 22} Mother's second assignment of error is sustained.

{¶ 23} Mother's Assignment of Error No. 1:

---

4. We note that there is also no indication in the record of what steps the Agency took to determine whether Lucy is an Indian child. Adm.Code 5101:2-53-02 mandates that public children services agencies follow all of the Indian child welfare rules and guidelines as outlined by ICWA. "For each referral the agency screens in, the public children services agency . . . shall ask case participants whether the participant knows or has reason to know . . . that the child is an Indian child." Adm.Code 5101:2-53-03.

THE TRIAL COURT'S DECISION TO GRANT THE AGENCY PERMANENT CUSTODY OF THE CHILD IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE AND NOT SUPPORTED BY SUFFICIENT EVIDENCE.

**{¶ 24}** Father's Assignment of Error:

THE TRIAL COURT ERRED IN FINDING, BY CLEAR AND CONVINCING EVIDENCE, THAT THE BEST INTEREST OF THE CHILDREN, PURSUANT TO THE FACTORS SET FORTH IN R.C 2151.414(D), WAS REACHED BY GRANTING PERMANENT CUSTODY TO WARREN COUNTY CHILDREN SERVICES.

**{¶ 25}** Mother's Assignment of Error No. 3:

THE TRIAL COURT'S CUMULATIVE ERROR VIOLATED THE MOTHER'S AND L.M.'S CONSTITUTIONAL RIGHT TO DUE PROCESS EVEN IF THE INDIVIDUAL ERROR DO NOT CONSTITUTE CAUSE FOR REVERSAL [SIC]

**{¶ 26}** Mother's first assignment of error, and Father's sole assignment of error each assert that the juvenile court's decision to grant permanent custody to the Agency was against the manifest weight of the evidence. Because we must reverse and remand this matter for the juvenile court to make a proper ICWA inquiry, it is premature to address Mother's and Father's arguments regarding the weight of the evidence. *See In re: D.E.* at ¶ 93. As such, we decline to address these assignments of error. Similarly, Mother's assignment of error alleging cumulative error in the permanent custody proceeding is also premature, pending remand for the proper ICWA inquiry to be made, and we decline to address it.

### III. Conclusion

**{¶ 27}** Having sustained Mother's second assignment of error, and found Mother's and Father's remaining assignments of error not yet ripe for review, we reverse the judgments of the Warren County Court of Common Pleas, Juvenile Division, and remand

these matters for further proceedings according to law and consistent with this opinion.

{¶ 28} We instruct the juvenile court to vacate its May 28, 2024 judgment granting permanent custody of Lucy to the Agency. Upon vacating the May 28, 2024 judgment, the February 7, 2024 motion for permanent custody will still be pending as there will be no dispositional orders resolving the same. Therefore, we order the juvenile court to defer entering dispositional orders on the motions until a proper ICWA inquiry is made of each participant in the permanent custody proceeding pursuant to 25 C.F.R. 23.107 and resolving ICWA applicability. The ICWA inquiry shall be made promptly upon remand of these cases.

{¶ 29} Judgment reversed, causes remanded with instructions for further proceedings.

HENDRICKSON, P.J., and PIPER, J., concur.

**PIPER, J., concurring separately.**

{¶ 30} I agree with the majority and join its opinion in full. The complete failure of a trial court to provide the necessary inquiries dictated by ICWA constitutes a very unique and narrow application of plain error. I write separately to expound on the possibility that this error may amount to structural error as well, which would also obviate any need for the appellant to demonstrate that the outcome of the trial would have been different but for the error.

{¶ 31} As the Ohio Supreme Court explained in *State v. Bond*, "Structural errors are constitutional defects that defy analysis by harmless-error standards because they 'affect[] the framework within which the trial proceeds, rather than simply an error in the trial process itself.'" 2022-Ohio-4150, ¶ 26, quoting *Arizona v. Fulminante*, 499 U.S. 279,

309-310 (1991). When a party asserts a structural error on appeal, but did not object to that error in the trial court, the plain error analysis still applies, thus the party must demonstrate that the error affected a substantial right. *Bond,* at ¶ 17. However, a structural error may affect substantial rights even if the defendant cannot show that the outcome of the trial would have been different had the error not occurred. *Id.* at ¶ 32.

{¶ 32} The precise reason for deeming an error structural varies significantly from error to error. *Id.* at 26. The Ohio Supreme Court has recognized three broad rationales for error to be deemed structural: (1) If the right at issue is not designed to protect the defendant from erroneous conviction but instead protects some other interest, like a defendant's right to self-representation; (2) If the effects of the error are simply too hard to measure, like the denial of a defendant's right to select his or her own counsel; and (3) if the error always results in fundamental unfairness, like the denial of an indigent criminal defendant's right to appointed counsel. *Id.* at ¶ 27-29. Crim.R. 52(B) does not require that the substantial rights affected belong to the party asserting the error, and it would "make little sense to require a defendant to demonstrate that the outcome of the trial would have been different to satisfy the plain-error standard if the error asserted were one that affected an interest not belonging to the defendant." *Id.* at ¶ 31. In *Bond,* the asserted error involved the right of the public and the press to an open courtroom. At ¶ 36.

{¶ 33} Of course, unlike *Bond* and typical examples of structural error in the criminal trial context, the present case deals with child permanent custody proceedings. Nevertheless, while ICWA is a statutory guarantee of certain court procedures, the failure to comply with ICWA at least implicates certain constitutional rights. The parents' interest in the care, custody, and control of their children "is perhaps the oldest of the fundamental

liberty interests recognized by this Court." *Troxel v. Granville*, 530 U.S. 57, 65, (2000). Parents who are "suitable" have a "paramount" right to the custody of their children. *In re Murray*, 52 Ohio St.3d 155, 157 (1990). In the words of the Ohio Supreme Court, the permanent termination of parental rights is "the family law equivalent of the death penalty in a criminal case," and therefore, parents "must be afforded every procedural and substantive protection the law allows." *In re B.C.*, 2014-Ohio-4558, ¶ 19.

{¶ 34} In accordance with these principles, and against the backdrop of historical abuses in custody proceedings involving Indian families, the Indian Child Welfare Act is aimed at safeguarding the continued existence and integrity of Indian Tribes by guaranteeing their right to assert jurisdiction in custody cases that involve Indian children, and the right of Indian children to be cared for by Indian families. Indian tribes possess "attributes of sovereignty over both their members and their territory," which includes "the power of regulating their internal and social relations." *New Mexico v. Mescalero Apache Tribe*, 462 U.S. 324, 332 (1983). To that end, ICWA codified notice provisions and affirmative duties to inquire in child custody proceedings that are reflective of the constitutional right to due process, both procedural and substantive.

{¶ 35} The independent interests involved in an ICWA violation touch on the rationale for applying a structural error analysis. Whether a child qualifies as an Indian for the purposes of ICWA has no bearing on whether the child's parents are fit to maintain custody. While parents may desire for their child to be placed with an Indian family in the event they do lose custody, ICWA also protects the interests of Indian tribes and Indian children in such placement.

{¶ 36} Further, the effect of denying a proper ICWA inquiry can be difficult to measure and, in some circumstances as here, impossible to measure. A child's Indian

or non-Indian status may or may not be readily apparent, a tribe may or may not choose to intervene or exercise jurisdiction, and it is unclear what effect the placement of one child will have on the continued existence of a tribe. All that is certain is, without any inquiry at all, the process itself is fundamentally affected, and there is no way for an appellate court to determine if that process was adverse to those involved or those who otherwise might have become involved.

{¶ 37} Ultimately, the appellants in this case have neither asserted structural error, nor raised any constitutional issues with regard to ICWA. Whether a court's failure to provide the inquiries mandated by ICWA is cognizable as structural error is a question for another day.