[Cite as *In re K.Y.*, 2025-Ohio-1117.]

COURT OF APPEALS
STARK COUNTY, OHIO
FIFTH APPELLATE DISTRICT

| | | |
|---|---|---|
| IN RE K.Y. | : | JUDGES: |
| | : | Hon. Craig R. Baldwin, P.J. |
| | : | Hon. Andrew J. King, J. |
| | : | Hon. David M. Gormley, J. |
| | : | |
| | : | |
| | : | Case No. 2024 CA 00176 |
| | : | |
| | : | O P I N I O N |

CHARACTER OF PROCEEDING:      Appeal from the Stark County Court of Common Pleas, Family Court Division, Case No. 2023JCV01401

JUDGMENT:      Affirmed

DATE OF JUDGMENT:      March 28, 2025

APPEARANCES:

For Appellant Mother

RICHARD D. HIXSON
3808 James Court, Suite 2
Zanesville, OH 43701

Guardian ad Litem for Mother

COLE BOND
116 Cleveland Avenue NW
Canton, OH 44702

For Appellee Agency

BRANDON J. WALTENBAUGH
402 2nd Street SE
Canton, OH 44702

Guardian ad Litem for K.Y.

DEAN GRASE
116 Cleveland Avenue NW, Suite 700
Canton, OH 44702

*King, J.*

{¶ 1}   Appellant mother, E.Y., appeals the September 3, 2024 judgment entry of the Court of Common Pleas of Stark County, Ohio, Family Court Division, terminating her parental rights and granting permanent custody of her child to appellee agency, Stark County Department of Job and Family Services ("SCDJFS").  We affirm the trial court.

FACTS AND PROCEDURAL HISTORY

{¶ 2}   On December 6, 2023, SCDJFS filed a complaint alleging a child, K.Y. born February 2023, to be dependent and/or neglected.  Mother of the child is appellant herein; father is S.S., incarcerated during the pendency of the case.  A case plan was filed on December 8, 2023.

{¶ 3}   An adjudicatory hearing was held on January 31, 2024; mother appeared and stipulated to dependency.  By judgment entries filed February 1, 2024, the trial court found the child to be dependent and placed the child in the temporary custody of SCDJFS. The trial court approved and adopted the case plan.

{¶ 4}   On July 9, 2024, SCDJFS filed a motion for permanent custody of the child. On August 15, 2024, mother requested a six-month extension of temporary custody.  A hearing was held before the trial court on August 29, 2024.   By judgment entry filed September 3, 2024, the trial court terminated all parental rights and granted permanent custody of the child to SCDJFS.   Findings of fact and conclusions of law were filed contemporaneously with the judgment entry.

{¶ 5}   Mother filed an appeal and assigned the following errors:

I

{¶ 6} "THE TRIAL COURT'S FINDING THAT K.Y. CANNOT BE PLACED WITH EITHER PARENT AT THIS TIME OR WITHIN A REASONABLE PERIOD OF TIME WAS UNSUPPORTED BY CLEAR AND CONVINCING EVIDENCE AND AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."

II

{¶ 7} "THE TRIAL COURT'S FINDING THAT PERMANENT CUSTODY WAS IN THE BEST INTERESTS OF THE CHILDREN WAS UNSUPPORTED BY CLEAR AND CONVINCING EVIDENCE AND AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."

III

{¶ 8} "THE TRIAL COURT COMMITTED PLAIN ERROR WHEN IT FAILED TO INQUIRE WHETHER THE CHILD WAS A MEMBER OF OR ELIGIBLE FOR MEMBERSHIP IN A FEDERALLY RECOGNIZED INDIAN TRIBE, PURSUANT TO THE INDIAN CHILD WELFARE ACT OF 1978."

I, II

{¶ 9} In her first and second assignments of error, mother claims the trial court erred in granting permanent custody of the child to SCDJFS, arguing the trial court's findings that grounds existed for permanent custody and that permanent custody was in the best interests of the child were not supported by clear and convincing evidence and were against the manifest weight of the evidence. We disagree with both assignments of error.

{¶ 10} On review for manifest weight, the standard in a civil case is identical to the standard in a criminal case: a reviewing court is to examine the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine "whether in resolving conflicts in the evidence, the jury [or finder of fact] clearly lost its way and created such a manifest miscarriage of justice that the conviction [decision] must be reversed and a new trial ordered." *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist. 1983). In *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997), quoting Black's Law Dictionary (6th Ed. 1990), the Supreme Court of Ohio explained the following:

Weight of the evidence concerns "the inclination of the *greater amount of credible evidence*, offered in a trial, to support one side of the issue rather than the other. It indicates clearly to the jury that the party having the burden of proof will be entitled to their verdict, if, on weighing the evidence in their minds, they shall find the *greater amount of credible evidence* sustains the issue which is to be established before them. Weight is not a question of mathematics, but depends on its *effect in inducing belief*." (Emphasis in original.)

{¶ 11} In weighing the evidence, we are always mindful of the presumption in favor of the trial court's factual findings. *Eastley v. Volkman*, 2012-Ohio-2179.

{¶ 12} R.C. 2151.414(B)(1) states permanent custody may be granted if the trial court determines, by clear and convincing evidence, that it is in the best interest of the child and:

(a) The child is not abandoned or orphaned . . . and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents.

(b) The child is abandoned.

(c) The child is orphaned, and there are no relatives of the child who are able to take permanent custody.

(d) The child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period . . . .

(e) The child or another child in the custody of the parent or parents from whose custody the child has been removed has been adjudicated an abused, neglected, or dependent child on three separate occasions by any court in this state or another state.

{¶ 13} Clear and convincing evidence is that evidence "which will provide in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." *Cross v. Ledford,* 161 Ohio St. 469 (1954), paragraph three of the syllabus. *See In re Adoption of Holcomb,* 18 Ohio St.3d 361 (1985). "Where the degree of proof required to sustain an issue must be clear and convincing, a reviewing court will examine the record to determine whether the trier of facts had sufficient evidence before it to satisfy the requisite degree of proof." *Cross* at 477.

{¶ 14} R.C. 2151.414(E) sets out the factors relevant to determining whether a child cannot be placed with either parent within a reasonable period of time or should not be placed with either parent.  Said section states in pertinent part the following:

(E) In determining at a hearing held pursuant to division (A) of this section or for the purposes of division (A)(4) of section 2151.353 of the Revised Code whether a child cannot be placed with either parent within a reasonable period of time or should not be placed with the parents, the court shall consider all relevant evidence.  If the court determines, by clear and convincing evidence, at a hearing held pursuant to division (A) of this section or for the purposes of division (A)(4) of section 2151.353 of the Revised Code that one or more of the following exist as to each of the child's parents, the court shall enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent:

(1) Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home.  In determining whether the parents have substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social

and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties.

(2) Chronic mental illness, chronic emotional illness, intellectual disability, physical disability, or chemical dependency of the parent that is so severe that it makes the parent unable to provide an adequate permanent home for the child at the present time and, as anticipated, within one year after the court holds the hearing pursuant to division (A) of this section or for the purposes of division (A)(4) of section 2151.353 of the Revised Code;

(4) The parent has demonstrated a lack of commitment toward the child by failing to regularly support, visit, or communicate with the child when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home for the child;

(16) Any other factor the court considers relevant.

{¶ 15} R.C. 2151.414(D)(1) sets forth the factors a trial court shall consider in determining the best interest of a child:

(D)(1) In determining the best interest of a child at a hearing held pursuant to division (A) of this section or for the purposes of division (A)(4) or (5) of section 2151.353 or division (C) of section 2151.415 of the Revised

Code, the court shall consider all relevant factors, including, but not limited to, the following:

    (a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;

    (b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;

    (c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period . . . ;

    (d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;

    (e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

{¶ 16} During the hearing, the trial court heard from the ongoing family caseworker (Kimberly Gabel), mother's psychological evaluator (Aimee Thomas, Ph.D.), representatives from the Goodwill Parenting Program (Jennifer Fire) and Help Me Grow (Shawnette Britton), and mother and father. The guardian ad litem submitted reports. As

explained by our brethren from the Second District in *In re A.J.S. & R.S.,* 2007-Ohio-3433, ¶ 22 (2d Dist.):

> Accordingly, issues relating to the credibility of witnesses and the weight to be given the evidence are primarily for the trier of fact. In this regard, "[t]he underlying rationale of giving deference to the findings of the trial court rests with the knowledge that the trial judge is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony." *Seasons Coal Co., Inc. v. Cleveland* (1984), 10 Ohio St.3d 77, 80, 461 N.E.2d 1273. Finally, an appellate court must adhere to every reasonable presumption in favor of the trial court's judgment and findings of fact. *In re Brodbeck,* 97 Ohio App.3d 652, 659, 647 N.E.2d 240, citing *Gerijo, Inc. v. Fairfield* (1994), 70 Ohio St.3d 223, 226, 1994-Ohio-432, 638 N.E.2d 533.

{¶ 17} Further, "'the discretion which the juvenile court enjoys in determining whether an order of permanent custody is in the best interest of a child should be accorded the utmost respect, given the nature of the proceeding and the impact the court's determination will have on the lives of the parties concerned.'" *In re Mauzy Children,* 2000 WL 1700073, *2 (5th Dist. Nov. 13, 2000), quoting *In re Awkal,* 95 Ohio App.3d 309, 316 (8th Dist. 1994).

{¶ 18} Kimberly Gabel testified SCDJFS first became involved with mother in May of 2023 because mother could not handle the three-month old child's crying; mother had thrown the child and tried to smother the child with a pillow. T. at 5. Safety plans were implemented and Ms. Gabel began working with the family in August 2023. *Id.* Non-court intensive services were provided to mother, but "the overall risk of harm was not able to be reduced" so the agency filed a formal complaint on December 6, 2023. T. at 6-7. Mother completed many of the objectives of her case plan, including obtaining assessments and mental health counseling, engaging in case management, and securing housing. T. at 8-9. Mother has PTSD and has "endured significant abuse and neglect throughout her life" at the hands of her parents; mother refused to take recommended prescribed medications that would help her. T. at 9-10, 24-26. Ms. Gabel had to track down mother's housing and was not convinced that mother was actually living at the purported address. T. at 10-11. Mother was unwilling to provide Ms. Gabel with "information in general" and mother often ignored the caseworker. T. at 11. Mother was easily influenced by others, refused to provide any supplies for the child, and did not visit with the child as often as she was offered or accompany the child to medical appointments. T. at 12-14. At times Ms. Gabel felt as if she was forcing mother to visit the child. T. at 13. Ms. Gabel believed mother was pregnant, but mother denied she was pregnant. T. at 14. Mother also denied being in a relationship, but the caseworker found evidence of a man in her life, a man with a child endangering charge. T. at 15-16. Ms. Gabel opined mother was not receptive to receiving help and did not "have a consistent pattern of being honest and truthful." T. at 15. The caseworker was concerned mother would be unable to keep the child safe and meet the child's needs. *Id.* Mother has a

low IQ and has lower cognitive abilities. T. at 17. Ms. Gabel testified while mother has gone through the motions of services, there have been no meaningful changes and there remained a large risk that has not been reduced. T. at 17-18. Ms. Gabel opined the significant risks to the child could not be alleviated in a year or in the foreseeable future. T. at 18. With all the intensive services mother has received, she has failed to make any significant progress and the caseworker had "no reason to believe that any extension of time would prove any different." T. at 31-32. While "D.D." services were discussed with mother several times, she refused to comply. T. at 35-36.

{¶ 19} Dr. Thomas performed mother's parenting evaluation. T. at 40-41; State's Exhibit A. Dr. Thomas confirmed mother had a traumatic childhood. T. at 41-42. Mother did not want to discuss her mental health issues which was common, but if mother could not acknowledge or accept her mental health symptoms, needed services could not be provided to help her. T. at 43. Dr. Thomas testified mother met the criteria for intellectual disabilities mild; "she's at a level of a 14-year old with verbal skills, but a 6-year old with regard to her non-verbal skills." T. at 43-44. Non-verbal skills are important "because that looks at the ability to take information from one setting and apply it to another." T. at 44. People with this level of intellectual disability require extensive support to raise children that would be indefinite; it does not get better over time or with additional education. T. at 46. Mother would need a lot of intensive family support to parent a child, but the "same people she would rely on are the people that were unable to keep her safe during childhood." T. at 47. Mother had trouble receiving, learning from, applying, and internalizing information. T. at 44. Her judgment thinking and cause and effect thinking were significantly impaired. *Id.* She would have difficulties "seeing potential negative

situations in the future" as well as identifying that someone with a criminal history would be bad to have around the child. T. at 55. She "would be more vulnerable to people who may be able to manipulate her." *Id.* These factors "can prevent her or preclude her from keeping the child safe." *Id.* During her conversations with mother, mother was defensive and avoidant. T. at 45. It was concerning to Dr. Thomas if mother refused her mental health medications, failed to successfully complete Goodwill Parenting, and was resistant to visiting the child because it could affect attachment and bonding with the child. T. at 48-49. Dr. Thomas recommended the Goodwill Parenting Program because it was able to meet mother's cognitive deficits by providing hands-on-learning and repetition. T. at 56. While Dr. Thomas offered recommendations to assist mother, they came "with a caveat, that there is concern that her prognosis was poor." T. at 46.

{¶ 20} Jennifer Fire from Goodwill Parenting testified mother completed the program and had perfect attendance. T. at 60; State's Exhibit B. But mother had an inability to demonstrate new skills and visitations with the child "were a really big struggle." T. at 61. She could not read her child's cues as to when the child was hungry or bored. *Id.* One-on-one assistance was offered to help mother, but she refused. T. at 63-65. Goodwill staff had to stand right over mother during some of the visitations for the safety of the child e.g., prevent mother from getting upset and grabbing the child. T. at 69. At the conclusion of the program, unsupervised visitations were not recommended because of mother's lack of progress and the step-by-step direction that was needed. T. at 72. Ms. Fire did not have any faith that if mother redid the program or participated in another program, she would be able to learn how to apply information learned. T. at 72-73.

{¶ 21} Shawnette Britton from Help Me Grow explained they are a home visiting program that provides parenting education. T. at 88-89. Help Me Grow became involved with mother through a referral from Aultman Hospital prior to the agency's involvement. T. at 90. At the beginning, the concern was mother's inability to recognize the child's cues. T. at 92. Mother was very receptive and did well with one-on-one instruction. T. at 93.

{¶ 22} The guardian ad litem filed a report recommending permanent custody to SCDJFS. Guardian ad Litem Report filed August 22, 2024.

{¶ 23} Under R.C. 2151.415(D), a trial court may extend temporary custody for up to six months "if it determines at the hearing, by clear and convincing evidence, that the extension is in the best interest of the child, there has been significant progress on the case plan of the child, and there is reasonable cause to believe that the child will be reunified with one of the parents or otherwise permanently placed within the period of extension."

{¶ 24} In its September 3, 2024 judgment entry, the trial court found notwithstanding reasonable case planning and SCDJFS's diligent efforts, mother "has failed continuously and repeatedly to remedy the conditions" that caused the child to be placed outside the home. The child cannot "be placed with either parent at this time or within a reasonable period of time" and "should not be placed with either parent." The trial court made extensive findings of fact relative to the factors under R.C. 2151.414. September 3, 2024 Findings of Fact and Conclusions at 7-28. The trial court found the caseworker's testimony to be credible and noted while mother completed many aspects of the case plan, she goes through the motions with no meaningful change to reduce

significant risks to the child. Mother lies and ignores issues, is uncooperative, lacks insight, is unable to read the child's cues, refuses to take prescribed medications to improve her mental health, and refuses one-on-one individual assistance; mother's thinking and cognitive skills are severely impaired. The trial court also noted the testimony revealed it would not make sense to give mother additional time to work the case plan because there has not been any significant change or progress with either the non-court or formal court phase; mother's prognosis was poor due to her issues and her low IQ, she cannot improve over time. Findings of Fact Nos. 80 and 107.

{¶ 25} This is a challenging case based on mother's developmental disability. She loves her child and wants to be her parent. But the best interest determination focuses on the child, not the parent. *In re C.T.*, 2020-Ohio-4965, ¶ 57 (5th Dist.). The agency attempted to connect mother with services to address her developmental disabilities, but mother refused the services. Even if mother complied, her IQ would not change and the paramount concern was for the safety of the child; witnesses testified mother would be unable to safely parent the child without intensive support.

{¶ 26} Based upon the cited testimony, we find there was clear and convincing evidence to support the trial court's findings that the child could not be placed with mother within a reasonable time and should not be placed with mother; the trial court did not abuse its discretion in denying an extension.

{¶ 27} During the best interest portion of the hearing, the caseworker testified the child has been in a third-party kinship home since August 2023, was bonded to the family, and was thriving. T. at 102-103. The caseworker opined mother loves the child, but was concerned she was not attached to the child. T. at 105. Mother has a good working

relationship with the kinship caregivers and she could potentially have some contact with the child throughout her life. T. at 102-103. The caseworker opined the benefit of permanent custody would outweigh any potential damage to the child and permanent custody was in the best interest of the child. T. at 106.

{¶ 28} Mother testified she would like to do the Goodwill Parenting Program again. T. at 112. She thought it would be different the second time "if they could help me a lot more, like with my learning disability and everything." *Id.* She requested more time to get her child back. T. at 113. On cross-examination, mother was evasive when asked if she was pregnant, but finally admitted that she was. T. at 114-115. Father of the baby is the man mother denied having a relationship with, the man with a conviction for child endangering. T. at 115-116. Mother does not believe anything that happened was his fault. T. at 116-117.

{¶ 29} As for best interests, the trial court made findings and determined "the harm caused by severing any bond with the parent is outweighed by the benefits of permanence" and the child deserves to be "in a stable, loving environment." September 3, 2024 Findings of Fact and Conclusions of Law.

{¶ 30} Based upon the testimony presented, we find clear and convincing evidence to support the trial court's decisions. We do not find the trial court lost its way in making the decisions to terminate mother's parental rights and grant permanent custody of the child to SCDJFS; we do not find any manifest miscarriage of justice.

{¶ 31} Assignments of Error I and II are denied.

{¶ 32} In her third assignment of error, mother claims the trial court committed plain error in failing to follow the Indian Child Welfare Act of 1978.  We disagree.

{¶ 33} The Indian Child Welfare Act was enacted "for the protection and preservation of Indian tribes and their resources."  25 U.S.C.A. 1901(2).  Congress was concerned that "an alarmingly high percentage of Indian families are broken up by the removal, often unwarranted, of their children from them by nontribal public and private agencies . . . .  25 U.S.C.A. 1901(4).  Congress acknowledged "there is no resource that is more vital to the continued existence and integrity of Indian tribes than their children and that the United States has a direct interest, as trustee, in protecting Indian children who are members of or are eligible for membership in an Indian tribe."  25 U.S.C.A. 1901(3).  Therefore, state courts are required to "ask each participant in an emergency or voluntary or involuntary child-custody proceeding whether the participant knows or has reason to know that the child is an Indian child.  The inquiry is made at the commencement of the proceeding and all responses should be on the record."  25 C.F.R. 23.107(a).  "A court's failure to identify Indian children can nullify court proceedings that have not been conducted in accordance with the Act."  *In re L.M.*, 2024-Ohio-5549 ¶ 13 (12th Dist.), citing Adm.Code 5101:2-53-02.

{¶ 34} Because Mother did not raise this issue in the trial court, she has forfeited all but plain error on appeal.  *In re S.M.*, 2025-Ohio-34, ¶ 15 (9th Dist.).  Civil plain error is "error, to which no objection was made at the trial court, seriously affects the basic fairness, integrity, or public reputation of the judicial process, thereby challenging the legitimacy of the underlying judicial process itself."  *Goldfuss v. Davidson*, 79 Ohio St.3d

116 (1997), syllabus.  In applying the doctrine, reviewing courts "must proceed with the utmost caution, limiting the doctrine strictly to those extremely rare cases where exceptional circumstances require its application to prevent a manifest miscarriage of justice, and where the error complained of, if left uncorrected, would have a material adverse effect on the character of, and public confidence in, judicial proceedings."  *Id.* at 121.

{¶ 35} The permanent custody hearing transcript is devoid of any inquiry as to whether the child was an Indian child.  But the Act states the inquiry "is made at the commencement of the proceeding."  An adjudicatory hearing was held on January 31, 2024, at which mother was present, and that transcript is not in the record.  Without a transcript to review, we presume the trial court conducted an inquiry at the commencement of these proceedings.  *In re S.M.*, 2025-Ohio-34 ¶ 16 (9th Dist.).  In addition, the December 12, 2023 and February 1, 2024 case plans that mother reviewed and agreed to indicated the child was not protected by the Act.

{¶ 36} The Act applies to an "Indian child" that means "any unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe." 25 U.S.C.A. 1903(4).  We note mother does not argue to this court that the child is an Indian child.  There is no indication the child is of Indian heritage or meets the criteria of 25 U.S.C.A. 1903(4).

{¶ 37} As cited by mother in her appellate brief at 22, Ohio courts have nullified determinations terminating parental rights and granting permanent custody to the agency in cases where the Act has not been followed.  *In re L.M.*, 2024-Ohio-5549 (12th Dist.);

*In re D.E.,* 2021-Ohio-524 (10th Dist.); *In re R.G.,* 2016-Ohio-7897 (8th Dist.). But we find these cases to be distinguishable. In *L.M.,* there was no indication that mother was put on notice of the potential for the Act to apply. Here, mother was put on notice via the case plans. In *D.E.,* the trial court failed to make a proper inquiry after mother claimed to have Native American heritage in her background. Here, there was no indication of Indian heritage. In *R.G.,* the trial court asked the caseworker at the initial hearing if the child had any Native American ancestry, outside the presence of the child's parents. Here, without a transcript of the initial hearing wherein mother was present, we can only presume mother was asked.

{¶ 38} Even assuming arguendo that the trial court failed to properly inquire, based on the state of the record before us, we cannot say that but for this "plain error" the Act would have been found to apply. We do not find any plain error that seriously affected the legitimacy of the underlying proceedings or caused a manifest miscarriage of justice.

{¶ 39} Assignment of Error III is denied.

{¶ 40} The judgment of the Court of Common Pleas of Stark County, Ohio, Family Court Division, is hereby affirmed.

By: King, J.

Baldwin, P.J. and

Gormley, J. concur.