[Cite as *In re B.M.*, 2025-Ohio-1786.]

COURT OF APPEALS
COSHOCTON COUNTY, OHIO
FIFTH APPELLATE DISTRICT

| | | |
|---|---|---|
| IN THE MATTER OF: | : | JUDGES: |
| | : | Hon. Craig R. Baldwin, P.J. |
| B.M. (DOB: 3/31/14) | : | Hon. Robert G. Montgomery, J. |
| C.M. (DOB: 12/8/15) | : | Hon. David M. Gormley, J. |
| P.-J.M. (DOB: 7/15/21) | : | |
| D.M. (DOB: 1/3/23) | : | |
| | : | Case Nos. |
| | : | 2024 CA 0023 |
| | : | 2024 CA 0024 |
| | : | 2024 CA 0025 |
| | : | 2024 CA 0026 |
| | : | |
| | : | O P I N I O N |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |

CHARACTER OF PROCEEDING:      Appeal from the Coshocton County Court of Common Pleas, Juvenile Division, Case Nos. 20233002, 20233003, 20233004, 20233005

JUDGMENT:      Affirmed

DATE OF JUDGMENT:      May 19, 2025

APPEARANCES:

For Coshocton County Job & Family Services

Katelynn R. Davis
Assistant Prosecuting Attorney
318 Chestnut St.
Coshocton, Ohio 43812


For Appellant – Father

Richard D. Hixson
3808 James Court, Suite 2
Zanesville, Ohio 43701

For Appellee – Guardian Ad Litem

Jeanette M. Moll
45 North 4th Street
Zanesville, Ohio 43702


For Mother

Diana E. Dudgeon
141 Front Avenue SE, P.O. Box 133
New Philadelphia, Ohio 44663

*Gormley, J.*

**{¶1}** Appellant father challenges the judgment of the Coshocton County Juvenile Court awarding permanent custody of four of his children, B.M., C.M., P.-J.M., and D.M., to the Coshocton County Department of Job and Family Services (the "Agency"). He contends that the trial court relied on improper statutory provisions at the permanent-custody hearing, that the trial court's judgment was unsupported by the evidence introduced at that hearing, and that the trial court failed to follow federal law. We find otherwise and now affirm.

**The Basic Facts**

**{¶2}** Father is the parent of B.M., C.M., P.-J.M., and D.M. Mother is the parent of P.-J.M. and D.M. A separate woman who is uninvolved in this appeal, M.E., is the parent of A.E., B.M., and C.M (the "Girls"). The father of A.E. is unknown. A.E., B.M., C.M., P.-J.M., and D.M. (the "Children") lived together with mother and father. Mother and father are also the parents of A.M. and M.M. (the "Twins"). The Twins and A.E. are not directly involved in this appeal.

**{¶3}** In March 2023, the Agency was awarded temporary custody of the Children after the Children were adjudicated "dependent" under R.C. 2151.04(C). A voluntary case plan was filed by the Agency the same month, and the Children were placed with their paternal grandparents.

**{¶4}** Less than two months later, the Children were removed from that placement because the Agency received reports describing emotional and physical abuse, neglect, and domestic violence between the grandparents, as well as unauthorized visits by mother and father.

**{¶5}** The Girls were then placed with their paternal aunt and uncle, and P.-J.M. and D.M. were placed in a licensed foster home. Within four months of those placements, the Children again were moved into new homes. The Girls were placed together with Derek and Victoria Burke, and P.-J.M. and D.M. were placed together in the home of John and Bethany Yoder.

**{¶6}** P.-J.M. and D.M. have remained together in their placement with the Yoders since June 2023, and the Girls have remained together in their placement with the Burkes since September 2023.

**{¶7}** In January 2024, the Twins were born. The Agency, that same day, moved for and was granted emergency temporary custody of the Twins. At the subsequent temporary-custody hearing, the trial judge — noting the physical challenges, neglect, and emotional trauma experienced by the Children — adjudicated the Twins "dependent" under R.C. 2151.04(C). The Twins were placed in a foster home with Brandon and Brenda Troyer, where they have remained since.

**{¶8}** In May 2024 — more than one year after the Children were first placed in the Agency's temporary custody — the Children's guardian ad litem filed a motion in the trial court, under R.C. 2151.414, requesting that permanent custody of the Children and the Twins be awarded to the Agency. The Agency consented to that permanent-custody motion and appeared at the full hearing.

**{¶9}** Immediately prior to the permanent-custody hearing, M.E. voluntarily and permanently surrendered her parental rights over the Girls. After the hearing concluded, the trial judge granted permanent custody of the Children to the Agency, but he declined

to grant the Agency permanent custody of the Twins.  Father now appeals the permanent-custody judgment for B.M., C.M., P.-J.M., and D.M only.  Mother did not appeal.

### R.C. 2151.414 Governs Permanent-Custody Motions Filed by A Guardian Ad Litem

{¶10} In his first assignment of error, father argues that the trial court was not permitted to hold a permanent-custody hearing under R.C. 2151.414 because the underlying motion for permanent custody here was filed by a guardian ad litem rather than by a children services agency.  He contends that R.C. 2151.353(A)(4) — which lacks the statutory provisions relied upon by the trial court in its judgment below — governs this case.

{¶11} The Supreme Court of Ohio, in *In re C.T.*, 2008-Ohio-4570, ¶ 19, recognized "that a guardian ad litem has authority. . . to file and prosecute a motion to terminate parental rights and award permanent custody."  In that case, the Court concluded that two separate provisions of the Revised Code allow a guardian ad litem to file permanent-custody motions: R.C. 2151.281(I) and R.C. 2151.415(F).

{¶12} R.C. 2151.281(I) provides guardians ad litem with a general grant of authority to act in the best interest of children.  It provides that the guardian ad litem of a child that is alleged to be dependent "shall perform whatever functions are necessary to protect the best interest of the child . . . and shall file any motions and other court papers that are in the best interest of the child in accordance with rules adopted by the supreme court." *Id.*

{¶13} R.C. 2151.415(F) specifically empowers a guardian ad litem to file permanent-custody motions.  That section states that "[t]he court, on its own motion or the motion of the agency or person with legal custody of the child, the *child's guardian ad*

*litem*, or any other party to the action, may conduct a hearing . . . to determine . . . whether any other dispositional order set forth in divisions (A)(1) to (5) of this section should be issued." (Emphasis added.) *Id.*

**{¶14}** R.C. 2151.415(A), in turn, states that "a public children services agency or private child placing agency that has been given temporary custody of a child . . . shall file a motion with the court that issued the order of disposition requesting that any of the following orders of disposition of the child be issued by the court." "An order permanently terminating the parental rights of the child's parents" is one of the five enumerated dispositional orders. R.C. 2151.415(A)(4).

**{¶15}** To be sure, in its recital of who may file motions for dispositional orders, R.C. 2151.415(A) references only "a public children services agency or private child placing agency that has been given temporary custody of a child." The Supreme Court has already found, though, that that statutory provision does not limit the ability of others to pursue child-placement orders. *See In re C.T.*, 2008-Ohio-4570, at ¶ 18 ("Although those statutes [R.C. 2151.413, 2151.414, and 2151.415] refer to motions filed by a public children services agency or a private child placing agency, there is no language that mandates that only an agency may file for permanent custody"). R.C. 2151.415(F), moreover, explicitly provides that such motions may be filed by the court, the agency with legal custody of the child, the child's guardian ad litem, or any other party to the action.

**{¶16}** Under R.C. 2151.415(B), a dispositional order that permanently terminates parental rights must be conducted "in accordance with sections 2151.413 and 2151.414 of the Revised Code." We therefore conclude that a permanent-custody motion that is filed by a guardian ad litem is governed by R.C. 2151.414. *See In re A.T.*, 2020-Ohio-

2781, ¶ 22 (3d Dist.) (reviewing permanent-custody adjudication for R.C. 2151.414 factors when permanent-custody motion was filed by a guardian ad litem).

{¶17} We are unpersuaded by father's interpretation of Ohio law. The trial court correctly conducted the permanent-custody hearing under R.C. 2151.414. Father's first assignment of error is overruled.

## The Evidence Supports the Trial Court's Permanent-Custody Adjudication

{¶18} In his second and third assignments of error, father challenges the merits of the trial judge's permanent-custody adjudication on grounds of weight and sufficiency.

{¶19} We note that the manifest-weight-of-the-evidence and sufficiency-of-the-evidence standards — rather than an abuse-of-discretion standard — are the proper appellate rubrics that we must use when reviewing the evidence in permanent-custody appeals. *In re Z.C.*, 2023-Ohio-4703, ¶ 18.

{¶20} "In determining whether a [judgment] is against the manifest weight of the evidence, the court of appeals functions as the 'thirteenth juror,' and after 'reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be overturned and a new trial ordered.'" *State v. Hane*, 2025-Ohio-120, ¶ 20 (5th Dist.), quoting *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997).

{¶21} "In weighing the evidence, the court of appeals must always be mindful of the presumption in favor of the finder of fact." *State v. Butler*, 2024-Ohio-4651, ¶ 75 (5th Dist.). "'The underlying rationale of giving deference to the findings of the trial court rests with the knowledge that the [trial judge] is best able to view the witnesses and observe

their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony.'" *State v. Williams*, 2024-Ohio-5578, ¶ 61 (5th Dist.), quoting *Seasons Coal Co., Inc. v. City of Cleveland*, 10 Ohio St.3d 77, 80 (1984). "[A]n appellate court will defer to the finder of fact on issues of weight and credibility of evidence, as long as a rational basis exists in the record for its decision." *Hutson v. Meyers*, 2022-Ohio-1622, ¶ 23 (5th Dist.), citing *State v. Ricer*, 2018-Ohio-426, ¶ 12 (5th Dist.).

**{¶22}** "Our standard of reviewing the sufficiency of the evidence in a civil case is whether, after viewing the evidence in a light most favorable to the prevailing party, the judgment is supported by competent and credible evidence." *Kerbler v. Biltwell Contracting LLC*, 2024-Ohio-5607, ¶ 73 (5th Dist.), citing *Moran v. Gaskella*, 2012-Ohio-1158, ¶ 12 (5th Dist.). A judgment "will not be disturbed unless the appellate court finds that reasonable minds could not reach the conclusion reached by the trier-of-fact." *State v. Dennis*, 79 Ohio St.3d 421, 430 (1997).

## A. The Statutory Framework of R.C. 2151.414

**{¶23}** A trial court "may grant permanent custody of a child to a movant if the court determines . . . by clear and convincing evidence, that it is in the best interest of the child to grant permanent custody of the child to the agency" and that any one of the five factors enumerated in R.C. 2151.414(B)(1)(a) through (e) applies. R.C. 2151.414(B)(1). R.C. 2151.414(B), therefore, "establishes a two-pronged analysis." *Matter of K.H.*, 2025-Ohio-21, ¶ 30 (5th Dist.). "In practice, the trial court will usually determine whether one of the . . . circumstances delineated in R.C. 2151.414(B)(1)(a) through [(e)] is present before proceeding to a determination regarding the best interest of the child." *Id.*

**{¶24}** Clear and convincing evidence is evidence "'which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established.'" *Id.* at ¶ 26, quoting *Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus. "'Where the proof required must be clear and convincing, a reviewing court will examine the record to determine whether the trier of facts had sufficient evidence before it to satisfy the requisite degree of proof.'" *Z.C.*, 2023-Ohio-4703, at ¶ 8, quoting *State v. Schiebel*, 55 Ohio St.3d 71, 74 (1990).

## B. Prong One: The Prerequisite For a Best-Interest Analysis

**{¶25}** R.C. 2151.414(B)(1) lists five scenarios, any one of which can serve as a prerequisite for a trial court's consideration of a permanent-custody request. The trial judge here found that R.C. 2151.414(B)(1)(d) applied to the Children. "As long as one of these factors is present, then the first prong of the test is satisfied." *Matter of A.S.*, 2024-Ohio-2099, ¶ 36 (5th Dist.).

**{¶26}** R.C. 2151.414(B)(1)(d) is met when "[t]he child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period."

## C. Prong Two: The Best-Interest Analysis

**{¶27}** In determining whether granting permanent custody of a child to an agency is in that child's best interest, the trial judge must consider all relevant factors, including, but not limited to, those listed in R.C. 2151.414(D)(1).

**{¶28}** Those factors include the child's interactions and relationships with the child's family members and persons who may significantly affect the child, the wishes of the child (with due regard to the maturity of the child), the custodial history of the child,

the child's need for a legally secure placement, and whether that type of placement can be achieved without a grant of permanent custody to the agency.

**{¶29}** "A child's best interests are served when the child is placed in a permanent situation which fosters growth, stability, and security." *In re M.K.*, 2023-Ohio-3786, ¶ 36 (5th Dist.). "'The discretion which the juvenile court enjoys in determining whether an order of permanent custody is in the best interest of a child should be accorded the utmost respect, given the nature of the proceeding and the impact the court's determination will have on the lives of the parties concerned.'" *Id.*, quoting *In re E.H.*, 2022-Ohio-1682, ¶ 101 (5th Dist.).

### D. The Trial Court Correctly Determined That R.C. 2151.414(B)(1)(d) Applies

**{¶30}** "This Court has adopted the position that proof of temporary custody with an agency for twelve or more months of a consecutive twenty-two-month period alone is sufficient to award permanent custody." *In re D.B.*, 2024-Ohio-1872, ¶ 63 (5th Dist.), citing *Matter of O.M.*, 2021-Ohio-1310, ¶ 33 (5th Dist.).

**{¶31}** Katie Barnett, a caseworker at the Agency assigned to work with the Children, testified at the permanent-custody hearing about the history of the Children's temporary-custody placements. She testified that the Children were adjudicated as dependent and placed into the Agency's temporary custody in March of 2023, and a copy of the trial court's temporary-custody judgment entry was admitted into evidence. She also testified that the Children had remained in the temporary custody of the Agency for more than 12 of the 22 months preceding the permanent-custody hearing.

**{¶32}** This unchallenged evidence clearly and convincingly shows that R.C. 2151.414(B)(1)(d) was met.

### E. The Trial Court Correctly Determined That Awarding Permanent Custody to the Agency Was in the Children's Best Interest

**{¶33}** Having found that R.C. 2151.414(B)(1)(d) was met, we now turn to the trial court's best-interest-of-the-child analysis. We find clear and convincing evidence in the record that granting permanent custody of the Children to the Agency was in the Children's best interest.

**{¶34}** The evidence at the permanent-custody hearing established that placement with mother and father would not be in the Children's best interest. Testimony was introduced that mother and father fell out of contact with the Agency, failed to regularly attend substance-abuse treatment and parental-education classes, and failed to make substantial progress on their case plans. Mother tested positive for methamphetamine — while pregnant with the Twins — at a time when she was supposed to be complying with a case plan that called for her to refrain from the use of illegal drugs. Father also tested positive for methamphetamine while his case plan was in effect, and he threatened to kill one of the caseworkers employed by the Agency.

**{¶35}** Substantial evidence of abuse and neglect was also introduced at the permanent-custody hearing. Throughout the period of temporary custody, the Girls repeatedly stated that they did not want to live with mother. Each of them stated that they were afraid of living with mother, and they described instances when mother threatened to slit their throats as well as times when mother locked them outside of the home during cold winter nights. The Girls identified mother as an unsafe person and reported being afraid of living in the same home as her. The Girls also reported being forced to sleep together in a closet because their beds were infested with bedbugs. Father, too, wrote a police statement — after a domestic dispute with mother — indicating that mother had

threatened to stab him and the Children in their sleep. Father later told a caseworker from the Agency that he did not believe that P.-J.M. was safe in the home with mother. Father, however, continues to live with mother.

**{¶36}** The evidence at the permanent-custody hearing also established that the Children are closely bonded to their foster families. Bethany Yoder, the foster mom of P.-J.M. and D.M., testified that P.-J.M. was bonded with her, her husband, and the rest of her extended family. She stated that P.-J.M.'s needs were being satisfied, and that P.-J.M. was meeting all of her developmental milestones. Bethany also testified that D.M. — who was born with infantile nystagmus that is suspected to have been caused by mother's drug use while pregnant — is being taken to all of his medical and physical-therapy appointments, that he had a corrective surgery performed in April 2024, and that he is otherwise meeting all of his developmental milestones. Bethany concluded her testimony by stating that she and her husband are closely bonded to P.-J.M. and D.M., that those two caregivers are willing and able to permanently provide for P.-J.M. and D.M.'s needs, and that they intend to pursue adoption.

**{¶37}** Victoria Burke, the foster mom of the Girls, testified that she is close with the Girls and that the Girls have become strongly attached to her and her husband. She stated that, since being placed into temporary custody with her and her husband, B.M. and C.M.'s grades in reading and math have doubled, and the Girls have opened up about the experiences that they had while living with mother and father. She reported that the Girls have joined extracurricular organizations for cheerleading and basketball, and she testified that the Girls' teachers have described a significant improvement in the Girls' behavior at school. The Girls all reported to the Agency that they wished to remain

with Derek and Victoria Burke, and the Burkes have expressed their intent to adopt the Girls.

**{¶38}** At the conclusion of the hearing, the guardian ad litem testified that a permanent-custody grant would be in the Children's best interest, given mother and father's inability to care for the Children, together with the stability that the Children have found in their new placements.

**{¶39}** After carefully reviewing the record, we conclude that sufficient evidence was introduced showing that the best-interest factors favor granting permanent custody of the Children to the Agency, and the weight of that evidence, too, strongly favors a grant of permanent custody. Because both prongs of the permanent-custody test have been proven in this case, the trial judge properly terminated mother and father's parental rights and placed the Children in the permanent custody of the Agency. Father's second and third assignments of error are overruled.

## The Trial Judge's Alleged Violation of The Indian Child Welfare Act Does Not Rise to The Level of Plain Error

**{¶40}** In his final assignment of error, father argues that the trial court violated the Indian Child Welfare Act (the "ICWA") by not asking if any of the children were members of a federally recognized Indian tribe.

**{¶41}** "The Indian Child Welfare Act was enacted 'for the protection and preservation of Indian tribes and their resources.'" *In re K.Y.*, 2025-Ohio-1117, ¶ 33 (5th Dist.), quoting 25 U.S.C. 1901(2). Under the ICWA, "state courts are required to 'ask each participant in an emergency or voluntary or involuntary child-custody proceeding whether the participant knows or has reason to know that the child is an Indian child. The inquiry is made at the commencement of the proceeding and all responses should be on

the record.'" *Id.*, quoting 25 C.F.R. 23.107(a). The failure of a state court to identify children covered by the ICWA "'can nullify court proceedings that have not been conducted in accordance with the Act.'" *Id.*, quoting *In re L.M.*, 2024-Ohio-5549, ¶ 13 (12th Dist.). A child is covered by the ICWA if that child is unmarried and "under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe[.]" 25 U.S.C. 1903(4).

**{¶42}** The failure of a parent to raise an ICWA objection at the trial court forfeits all but plain error. *In re K.Y.* at ¶ 34. In civil cases, plain error "may be applied only in the extremely rare case involving exceptional circumstances where error, to which no objection was made at the trial court, seriously affects the basic fairness, integrity, or public reputation of the judicial process, thereby challenging the legitimacy of the underlying judicial process itself." *Goldfuss v. Davidson*, 79 Ohio St.3d 116 (1997), syllabus.

**{¶43}** At the permanent-custody hearing, the trial judge did not ask whether any of the Children were covered by the ICWA. Father did not, however, raise an ICWA objection in the trial court, and he therefore must demonstrate that the judge's failure to ask about the ICWA rises to the level of plain error. Father does not point to any evidence in the record, or even allege, that any of the Children are covered by the ICWA. Moreover, we note that mother and father's case plans — which were filed in the trial court and are contained in the record — explicitly state that none of the Children fall within the ICWA's definition of an Indian child. Father had access to those case plans for months and had an opportunity to challenge the ICWA findings at the permanent-custody hearing.

**{¶44}** We do not view this case as one of "those extremely rare cases where" civil plain error applies. *Goldfuss* at 121. *See also Matter of R.M.*, 2025-Ohio-1421, ¶ 35 (5th Dist.) (finding no plain error in a trial judge's failure to make an ICWA inquiry where parent failed to raise an ICWA objection in trial court). Father's final assignment of error is overruled, and the trial court's judgment is affirmed.

By: Gormley, J.

Baldwin, P.J. and

Montgomery, J. concur.